[No. S011121. Feb. 24, 1992.]

LUSARDI CONSTRUCTION COMPANY, Plaintiff and Respondent, v.
LLOYD W. AUBRY, JR., as Labor Commissioner, etc., et al., Defendants
and Appellants.

**COUNSEL**

H. Thomas Cadell, Jr., for Defendants and Appellants.

Donald C. Carroll, Charles P. Scully II and Frances C. Schreiberg as Amici Curiae on behalf of Defendants and Appellants.

Corona & Prager, Thierman, Cook, Brown & Prager, John W. Prager, Jr., and Berta Peterson-Smith for Plaintiff and Respondent.

Tonsing & Tonsing, Jon P. Tonsing, Crosby, Heafey, Roach & May, Stephen A. McFeely and Gideon Kanner as Amici Curiae.

## OPINION

**KENNARD, J.**—The prevailing wage law governs wages and other conditions of employment on public works, which include "[c]onstruction, alteration, demolition or repair work done under contract and paid for in whole or in part out of public funds . . . ." (Lab. Code, § 1720, subd. (a); all further unlabeled statutory references are to the Labor Code.) "Public works" contracts awarded to private contractors must include stipulations requiring the contractors and subcontractors to pay their employees no less than the applicable prevailing wage rates, as determined by the Director of the Department of Industrial Relations (the Director). (§§ 1773.2, 1775.)

This case involves an $18 million expansion of a public hospital. To keep the construction costs as low as possible, the public entity entered into a written agreement with a third party corporation, which appointed the public entity as its agent for all purposes on the construction project. The public entity, purportedly acting as agent for the third party corporation, then hired a private contractor to construct the project, without entering into the statutorily required stipulations that the contractor pay its employees the prevailing wage rates.

The Director sought to require the contractor to pay its employees prevailing wages; the contractor then brought this action challenging enforcement of the law against it. The trial court granted injunctive and declaratory relief, and the Court of Appeal affirmed, concluding on constitutional and equitable grounds that the Director could not enforce the prevailing wage law against the contractor.

This case involves the following issues:

First, does the prevailing wage law apply only when the contractor agrees to comply with it as part of the contract, or does the obligation to pay prevailing wages have an independent statutory basis?

Second, is the Director statutorily authorized to make the administrative determination that a contract for the construction of a public improvement is one for a public work? If so, does the making of such a determination constitute an adjudication, so that procedural due process protections are required?

Third, does the doctrine of equitable estoppel preclude any determination that in this case the contractor is bound by the prevailing wage law?

Fourth, is a civil penalty sought to be imposed on the contractor by the state invalid?

We hold that the statutory obligation to pay the prevailing wage does not depend on the contractor's assent, that the Director may validly and constitutionally determine that a given project is for a public work, and that the doctrine of equitable estoppel does not prevent the Director from proceeding against the contractor. We emphasize, however, that the contractor may be entitled to indemnity from the public entity if it reasonably relied on the public entity's representations that the project was not subject to the prevailing wage law, and that when, as here, a contractor does rely in good faith on such representations, equity prohibits the imposition of statutory penalties against the contractor for failing to pay the prevailing wage.

We conclude that the judgment of the Court of Appeal should be reversed.

## FACTS

The parties stipulated to these facts: Tri-City Hospital District (the District) is a public hospital district and an independent political subdivision of the State of California. In 1983, the District wanted to expand its hospital facilities. On June 28, 1983, the District entered into a written agreement with Imperial Municipal Services Group, Inc. (Imperial), a private corporation, for the construction of new facilities at Tri-City Hospital (the Expansion Project). The contract with Imperial specified that the sole role of Imperial was that of the seller of the property, and that the District was

appointed as Imperial's "agent and attorney-in-fact for all purposes respecting construction of the Expansion Project, including, without limitation, the engagement of contractors . . . and the management and supervision of the construction of the Expansion Project." The contract further provided that "Purchaser [the District], as agent, shall cause contractors under such contracts to . . . pay prevailing wages in accordance with the California Labor Code . . . ."

Although Lusardi Construction Company (Lusardi) had served as a contractor on many public works, it made a business decision not to perform any public works contracts after 1980. During its negotiations with the District, Lusardi told the District that it did not enter into contracts for the construction of public works. The District represented to Lusardi that: (1) the Expansion Project was a private work and not a public work under the prevailing wage law, and therefore the payment of prevailing wages and keeping of payroll records was not required; (2) the District had received legal opinions determining that the Expansion Project was not a public work; and (3) Lusardi should compute its construction costs on the basis that the project was not a public work. Lusardi relied on the District's representations in calculating its construction costs.

With the District purportedly acting as Imperial's "agent," Imperial and Lusardi then entered into a contract for the construction of the Expansion Project. Lusardi agreed to construct a "four-phase," 108,000-square-foot addition to Tri-City Hospital at a maximum cost of $18,350,000. The contract between Imperial and Lusardi did not refer to prevailing wages.

In July 1983, Lusardi began work on the project. Lusardi and its subcontractors did not pay the prevailing wage, and did not comply with prevailing wage law requirements governing the hiring of apprentices and the maintenance of certified payroll records. After two and one-half years, Lusardi had completed significant portions of the project.

In January 1986, the Director informed the District in writing of his tentative determination that the Expansion Project was a public work. In

May, the Division of Labor Standards Enforcement (the DLSE), a part of the Department of Industrial Relations (the Department), requested Lusardi to submit payroll records, and warned that failure to comply would subject Lusardi to statutory penalties. In August, the Director notified Lusardi and the District that he had made a final determination that the Expansion Project was a public work. In September, the Division of Apprenticeship Standards (the DAS), another arm of the Department, requested evidence of compliance with the statutory apprenticeship requirements from Lusardi.

When Lusardi did not submit the certified payroll records, the DLSE sent a "penalty assessment letter" to the District in November 1986, with a copy to Lusardi. The DLSE purported to assess a statutory penalty of $25 per day per employee, calculated on the basis of a minimum of 200 employees, retroactive to August 1986. Although the construction contract provided that Lusardi was paid by Imperial and not by the District, the DLSE directed the District to withhold future payments due Lusardi, and to increase the amount withheld by $5,000 a day for each day of noncompliance beyond November 13, 1986.

The DAS wrote to Lusardi on November 13, 1986, that if it did not receive satisfactory proof of compliance with the statutory apprenticeship requirements within five days of the letter's receipt, it would initiate "proceedings for determination of willful noncompliance . . . pursuant to Labor Code section 1777.7. . . ." The DLSE and the DAS warned Lusardi that it could be subject to back-wage payments, civil penalties, public work debarment, and civil and administrative litigation.

In November 1986, Lusardi filed this lawsuit and ceased all work on the Expansion Project. Lusardi's complaint sought declaratory and injunctive relief, alleging that the prevailing wage provisions of the Labor Code could not lawfully be applied to it consistent with due process.[1]

The trial court issued a temporary restraining order and a preliminary injunction restraining defendants from enforcing or attempting to enforce the prevailing wage law against Lusardi. It subsequently granted Lusardi's motion for summary judgment. Based on the stipulated facts, the trial court ruled that the prevailing wage law could not be applied to Lusardi because of

---

[1]The DLSE filed a cross-complaint against the District alleging that the District had engaged in an unlawful scheme to circumvent the prevailing wage law in an effort to reduce its construction costs. The trial court sustained the District's demurrer without leave to amend, and dismissed the cross-complaint. The Court of Appeal affirmed, and we granted review. *Aubry* v. *Tri-City Hospital Dist.* (1989) 234 Cal.App.3d 510 [265 Cal.Rptr. 451], review granted March 15, 1990 (S011123), is now pending in this court.

the absence of the requisite contractual provisions and because Lusardi's due process rights had been violated.

The trial court determined that under the prevailing wage law the responsibility for ensuring that the prevailing wage provisions were in a public work contract was on the agency awarding the contract. Because the contract contained no provisions requiring the prevailing wage to be paid, the trial court ruled that Lusardi had acted reasonably as a matter of law in concluding that the prevailing wage law did not apply to it. The trial court also concluded that the Department's application of the public works standards to Lusardi violated Lusardi's right to reasonable notice and an opportunity to respond.

The Court of Appeal affirmed, holding that the Director's determination that the project was a public work without giving Lusardi notice and an opportunity to be heard violated procedural due process, and that the Director was barred under the doctrine of equitable estoppel from proceeding against Lusardi.

## DISCUSSION

### 1. *Overview of the Prevailing Wage Law*

The Legislature has declared that it is the public policy of California "to vigorously enforce minimum labor standards in order to ensure employees are not required or permitted to work under substandard unlawful conditions, and to protect employers who comply with the law from those who attempt to gain competitive advantage at the expense of their workers by failing to comply with minimum labor standards." (§ 90.5, subd. (a).) The conditions of employment on construction projects financed in whole or in part by public funds are governed by the prevailing wage law. (§§ 1720-1861.)

The overall purpose of the prevailing wage law is to protect and benefit employees on public works projects. (*O. G. Sansone Co. v. Department of Transportation* (1976) 55 Cal.App.3d 434, 458 [127 Cal.Rptr. 799].) Subject to an exception not relevant here, under section 1720, subdivision (a), "public works" include "[c]onstruction, alteration, demolition or repair work done under contract and paid for in whole or in part out of public funds . . . ." Section 1771 provides that not less than the general prevailing rate of wages must be paid to all workers employed on public works projects costing more than $1,000. Section 1770 requires the Director to make the prevailing wage rate determination, based on a method defined in section 1773.

Section 1773 requires the public entity "awarding any contract for public work, or otherwise undertaking any public work," to obtain from the Director the general prevailing rate for each craft, classification or type of worker needed to execute the contract. The public entity must specify those rates in its call for bids, in bid specifications, and in the contract or, alternatively, must specify in those documents that the prevailing wage rates are on file in its principal office. (§ 1773.2.)

A contractor for a public works project that fails to pay the prevailing rate to its workers is liable for the deficiency and is subject to a statutory penalty. (§ 1775.) Deficiencies and penalties are to be withheld by the awarding body from sums due under the contract. (§ 1727.) If the money due a contractor from an awarding body is insufficient to pay all of the imposed penalties and deficiencies, or if the public works contract does not provide for payments by the awarding body to the contractor, the DLSE is authorized to bring an action to recover the deficiencies due and penalties assessed. (§ 1775.)[2]

2. *Statutory Obligation by Contractor on Public Work to Pay Prevailing Wages*

■ The threshold issue here is whether the obligation of a contractor on a public works project to pay the prevailing wage is based exclusively on contractual provisions, or whether such an obligation flows from a statutory duty to pay the prevailing wage imposed on the contractor independent of any contractual requirement. The Court of Appeal implicitly assumed, without deciding, that the contractor's duty to pay prevailing wages arose from statute.

---

[2]Each contractor and subcontractor must maintain complete and accurate records showing the names, occupations, addresses and Social Security numbers of all workers employed on public works projects, and detailing the actual hours worked and wages paid. (§ 1776, subd. (a).) The awarding body must insert stipulations in the construction contract requiring compliance with the recordkeeping provisions. (§ 1776, subd. (g).) Certified copies of these records must be made available for inspection or furnished upon request to representatives of the awarding body or the Department. (§ 1776, subd. (b).) Failure to do so within 10 days after receipt of the request subjects the contractor or subcontractor to forfeiture of $25 "for each calendar day, or portion thereof, for each worker, until strict compliance is effectuated." (§ 1776, subd. (f).) Additionally, noncompliance may lead to prosecution on a misdemeanor charge. (§ 1777.)

This statutory scheme also governs the employment of apprentices. Section 1777.5 requires the employment of apprentices on public works projects under the terms of a statutory formula, and mandates that the awarding body insert stipulations in the construction contract requiring compliance with the apprenticeship provisions of the prevailing wage law. Section 1777.7 specifies sanctions for failure to comply with the apprenticeship requirements, including debarment from public works contracting and monetary penalties.

Any public agent who wilfully fails to comply with any provision of the prevailing wage law is guilty of a misdemeanor. (§ 1777.)

As noted above, sections 1773.2, 1775, 1776, subdivision (g), and 1777.5 generally require the contracting public entity, either through specifications in the notice for bids or by stipulations in any resulting contract, to notify the contractor of the applicability of the prevailing wage law and the possibility of penalties and forfeitures in the event of noncompliance. Lusardi contends that these statutes reflect a legislative intent that the prevailing wage laws are enforceable only when a provision requiring their observance is contained in the contract between the public agency and the contractor. We disagree.

Lusardi's proposed interpretation violates section 1771, which provides that "[e]xcept for public works projects of one thousand dollars ($1,000) or less, not less than the general prevailing rate of per diem wages . . . *shall be paid* to all workers employed on public works." (Italics added.) By its express language, this statutory requirement is not limited to those workers whose employers have contractually agreed to pay the prevailing wage; it applies to "*all* workers employed on public works." (Italics added.)

Moreover, Lusardi's proposed interpretation would defeat the legislative objective. The object that a statute seeks to achieve is of primary importance in statutory interpretation. (*People v. Jeffers* (1987) 43 Cal.3d 984, 997 [239 Cal.Rptr. 886, 741 P.2d 1127]; *Judson Steel Corp. v. Workers' Comp. Appeals Bd.* (1978) 22 Cal.3d 658, 669 [150 Cal.Rptr. 250, 586 P.2d 564].) The overall purpose of the prevailing wage law, as noted earlier, is to benefit and protect employees on public works projects. This general objective subsumes within it a number of specific goals: to protect employees from substandard wages that might be paid if contractors could recruit labor from distant cheap-labor areas; to permit union contractors to compete with nonunion contractors; to benefit the public through the superior efficiency of well-paid employees; and to compensate nonpublic employees with higher wages for the absence of job security and employment benefits enjoyed by public employees. (*Division of Lab. Stds. Enforcement v. Ericsson Information Systems, Inc.* (1990) 221 Cal.App.3d 114, 123 [270 Cal.Rptr. 75]; *O. G. Sansone Co. v. Department of Transportation, supra,* 55 Cal.App.3d at pp. 458-460.) These objectives would be defeated if we were to accept Lusardi's interpretation.

As the facts of this case show, both the awarding body and the contractor may have strong financial incentives not to comply with the prevailing wage law. To construe the prevailing wage law as applicable only when the contractor and the public entity have included in the contract language requiring compliance with the prevailing wage law would encourage awarding bodies and contractors to legally circumvent the law, resulting in payment of less than the prevailing wage to workers on construction projects

that would otherwise be deemed public works. To allow this would reduce the prevailing wage law to merely an advisory expression of the Legislature's view.

Lusardi argues that the legislative history of the prevailing wage law supports its position that the law applies only when the contractor agrees to it in writing. Yet there is nothing in the legislative history that establishes an intent by the Legislature that contractors on public works projects who failed to execute such agreements are not bound by the prevailing wage laws.[3] The awarding body and contractor are required to take steps to assure that the prevailing wage law is observed. It does not follow, however, that the law is intended to be optional with the contracting parties.

For these reasons, Lusardi's argument that the prevailing wage law applies only when the contractor assents to it in writing is rejected.

### 3. *Director's Authority to Determine Coverage*

■ The Court of Appeal assumed for the purpose of analysis that the Director could make the determination that a project was a public work. Lusardi contends that the Director has no statutory authority to determine that a construction project is a "public work" within the meaning of the Labor Code, and thus subject to the statutory requirement that "prevailing wages" be paid. We disagree.

The Director is the chief officer of the Department. (§ 51.) The stated function of the Department is to "foster, promote and develop the welfare of the wage earners of California, to improve their working conditions, and to advance their opportunities for profitable employment." (§ 50.5.) The Director's statutory authority is broad: "The director shall perform all duties, exercise all powers and jurisdiction, assume and discharge all responsibilities, and carry out and effect all purposes vested by law in the department,

---

[3]At least one feature in the legislative history of the statutory scheme strongly favors the conclusion that the Legislature intended the contractor's obligation to pay prevailing wages to be both statutory and contractual. Section 1781, before its repeal in 1957 (Stats. 1957, ch. 396, § 1, p. 1240), read: "The penalties and remedies provided for in sections 1775 and 1777 shall be the exclusive penalties and remedies against any contractor or subcontractor for any violation of sections 1770 to 1777 *or* of the provisions inserted in any call for bids, specifications or contracts pursuant thereto." (Italics added.)

The Legislature's use of the disjunctive "or" in this provision indicates that it viewed contractors and subcontractors as liable *either* for violation of their statutory obligation to pay prevailing wages, *or* for violation of their contractual stipulations to do so. The repeal of the statute does not change this, but merely clarifies that the Legislature no longer intends the statutory remedies to be exclusive. (See Comment, *Employee Rights: Enforcement of the Public Works Prevailing Wage Obligation* (1981) 14 Loyola L.A. L.Rev. 311, 328, fn. 110.)

except as otherwise expressly provided by this code." (§ 54.) The Director possesses explicit authority to make rules. Section 55 provides in pertinent part: "[T]he director may, in accordance with the provisions of [the Administrative Procedure Act], make such rules and regulations as are necessary to carry out the provisions of this chapter and to effectuate its purposes."[4]

These statutes establish a legislative intent to give the Director plenary authority to promulgate rules to enforce the Labor Code. Although no statute expressly gives the Director the authority to make regulations governing coverage, such authority is implied. " '[T]he authority of an administrative board or officer, . . . to adopt reasonable rules and regulations which are deemed necessary to the due and efficient exercise of the powers expressly granted cannot be questioned. This authority is implied from the power granted.' " (*California Drive-in Restaurant Assn.* v. *Clark* (1943) 22 Cal.2d 287, 303 [140 P.2d 657].) Thus, this court has previously upheld labor regulations under the same general statutory scheme "for which there is no express statutory or constitutional authority." (*Kerr's Catering Service* v. *Department of Industrial Relations* (1962) 57 Cal.2d 319, 330 [19 Cal.Rptr. 492, 369 P.2d 20].)

Under these standards, the Director's interpretation of the statutes as authorizing the making of regulations governing coverage of the prevailing wage laws is well within the broad scope of his authority. Exercising that authority, the Director has made regulations governing coverage of the prevailing wage law.[5] Under the regulations, issues of coverage of the prevailing wage law are determined by the Director or the DLSE as the Director's designee. Lusardi does not contend that the regulations themselves are invalid. For the reasons discussed earlier, we hold that the Director's interpretation of his statutory authority is reasonable, and that the Director has the power to determine that a construction project is a "public work."

---

[4]Section 59, part of the same chapter as sections 54 and 55, provides: "The department through its appropriate officers shall administer and enforce all laws imposing any duty, power, or function upon the offices or officers of the department."

[5]At the time of the coverage determination in this case, former California Administrative Code, title 8, section 16207.5 provided in relevant part: "The Director shall establish and coordinate the administration of the State's prevailing wage law, including the determination of coverage issues." (This regulation has since been recodified at California Code of Regulations, title 8, section 16100.) Former California Administrative Code, title 8, section 16207.7 specified: "Any issue as to coverage of or amount of the prevailing wage raised by an awarding body or other interested party shall be referred to the Director, except that if it involves an issue raised after a contract is let, DLSE shall exercise discretion in the enforcement of the law . . . . DLSE shall refer . . . any issue as to coverage which is not routine to the Director's office as soon as possible to coordinate with Departmental policy." (This regulation appears now in somewhat different language in California Code of Regulations, title 8, section 16301.)

### 4. *Due Process Implications of Director's Coverage Determinations*

■ Lusardi contends that the Director's determination in August 1986 that the Expansion Project was a public work without affording Lusardi notice and an opportunity to be heard violated its right to procedural due process under the state and federal Constitutions. This argument mirrors the reasoning of the Court of Appeal, which held that because the administrative finding that a project was a public work was of great importance to the contractor, procedural due process attached. We disagree.

The Court of Appeal correctly observed that procedural due process "does not require any particular form of notice or type of hearing." Thereafter, the Court of Appeal focused exclusively on the importance of the interests involved. The court stated that whether the project was a public work was "a matter of great importance to the contractor." The court found it significant that the Director had promulgated regulations allowing for hearings to determine prevailing wage rates; this was, in the court's view, another "important determination" to be made in connection with the prevailing wage law, though not directly relevant to this case. The court observed that it could "conceive of no adjudication under the prevailing wage law more important to a contractor than the foundational adjudication of the very nature of the job—whether it is 'public' or 'private' works." The court then concluded that Lusardi's due process rights had been violated by this adjudication.

The Court of Appeal erred in assuming that the Director's determination that the project was a public work is an "adjudication" resulting in a deprivation requiring procedural due process.

Careful review of the statutory scheme, however, makes clear that the Director has no power to adjudicate whether a project is a public work, or to independently deprive a contractor such as Lusardi of any property interest. Instead, when the contract does not provide for a money payment from the awarding body to the contractor, the Director is authorized under the statute only to bring charges in court against a contractor for failing to pay the prevailing wage. The court has the sole power to determine whether the contractor is liable for any underpayment, and to make a binding order that the payments be made. The Director's role in this process is purely prosecutorial.

The statute governing this case is section 1775. It provides, in pertinent part: "[I]n all cases where the contract does not provide for a money payment by the awarding body to the contractor, the awarding body shall

notify the [DLSE] of the violation and the [DLSE], if necessary with the assistance of the awarding body, *may maintain an action in any court of competent jurisdiction* to recover the penalties and the amounts due provided in this section." (Italics added.)

Here, the contract did not provide for a money payment from the District to Lusardi. Accordingly, the Director, through the DLSE, was authorized to bring an action in court for recovery of the underpayment. Contrary to the Court of Appeal's assumption, the Director was not authorized to, and did not, "adjudicate" anything. The Director's role in deciding that the prevailing wage law had been violated was no more "adjudicatory" than a district attorney's decision that a criminal statute has been violated.

It is true that after the Director made his determination that the project was a public work, he caused the DLSE to direct the District to withhold purported future payments to Lusardi. This did not result in a deprivation of property. Because "the contract does not provide for a money payment by the awarding body to the contractor" (§ 1775), this purported direction to withhold payments was meaningless.[6] The DLSE ordered the District to perform an impossible act.

The Director did not order Lusardi to begin paying the prevailing wage, nor did the Director have any power to do so. The DAS did warn Lusardi that if it did not comply with the statutory apprenticeship requirements, the DAS would initiate "proceedings for determination of willful noncompliance . . . pursuant to . . . section 1777.7 . . . ." The DAS has not, however, initiated such proceedings.

Thus, what the Director and his designees did in this case was to notify the District and Lusardi that, in the view of the authorities, the project was a public work and the prevailing wage law applied. There is no statute requiring the Director to so notify an awarding body or contractor; apparently the Director did so in the hope that voluntary compliance could avoid the necessity to bring an action under section 1775. But before the Director could bring a court action to recover the amounts due under section 1775, Lusardi sued the Director, claiming its due process rights were violated.

---

[6]In this case the District, though it did not directly award the contract to Lusardi, is the awarding body within the meaning of the statutory scheme. As explained earlier, the District entered into a contract under which Imperial, a private corporation, would build the Expansion Project and sell the completed Expansion Project to the District; the contract provided that the District was appointed as Imperial's "agent . . . for all purposes . . . including, the engagement of contractors . . . and the management and supervision of the Expansion Project." As Imperial's "agent," the District negotiated with Lusardi for the award of the construction contract. Under section 1722, "awarding body" means "department, board, authority, officer or *agent* awarding a contract for public work." (Italics added.)

There is apparently no case that is precisely on point. But there is a substantial body of case law that is wholly supportive of the conclusion that a party in Lusardi's situation has no procedural due process rights to notice or a hearing until an executive branch official files formal civil or criminal charges against it.

Thus, in *SEC* v. *Jerry T. O'Brien, Inc.* (1984) 467 U.S. 735, 742 [81 L.Ed.2d 615, 621, 104 S.Ct. 2720], the high court stated that "because an administrative investigation adjudicates no legal rights," the due process clause of the federal Constitution is "not implicated . . . ." In the context of administrative process that, unlike the main procedure at issue here, does include an administrative hearing, the courts have consistently held that "due process do[es] not require a hearing at the initial stage or at any particular point or at more than one point in an administrative proceeding so long as the requisite hearing is held before the final order becomes effective." (*Opp Cotton Mills* v. *Administrator* (1941) 312 U.S. 126, 152-153 [85 L.Ed. 624, 640, 61 S.Ct. 524]; see *Hodel* v. *Virginia Surface Mining & Recl. Assn.* (1981) 452 U.S. 264, 303 [69 L.Ed.2d 1, 33, 101 S.Ct. 2352].)

In the more closely related context of official action that, like a criminal prosecution and the procedure under section 1775, contemplates not an administrative hearing but a court trial after an executive official has filed charges, the courts have also refused to hold that procedural due process requires notice and a hearing prior to the filing of charges.

A representative analysis is found in *Baltimore Gas & Elec. Co.* v. *Heintz* (4th Cir. 1985) 760 F.2d 1408, 1419, certiorari denied 474 U.S. 847 [88 L.Ed.2d 116, 106 S.Ct. 141]: "The mere determination to enforce the statute or regulation in some cases and not to enforce [it] in others, without more, may entitle one to an explanation from the agency designed to facilitate judicial review of the decision, but such an action does not constitute a deprivation of due process. That standard has 'generated an almost unbroken line of cases upholding prosecutors' powers to decide who and how to charge.' [Citations.]" (Accord, e.g., *United States* v. *Patterson* (9th Cir. 1972) 465 F.2d 360, 361, cert. den. 409 U.S. 1038 [34 L.Ed.2d 487, 93 S.Ct. 516] ["It is sufficient if a hearing is had prior to the final order which deprives the person of his liberty."].)

■ Thus, the case law establishes that a person against whom criminal or civil charges may be filed has no procedural due process right to notice and a hearing until and unless an executive branch official actually files formal civil or criminal charges.

A contrary conclusion would result in serious mischief. For example, a place of prostitution that learned that the district attorney planned to file a

civil "red light" action against it to abate a nuisance could demand that, before charges were filed, a hearing be held on the prosecutor's decision to file. (But see Pen. Code, § 11225 et seq.) Or the Attorney General, having decided to seek an injunction under the unfair competition statute to halt a campaign of false advertising targeting senior citizens, would be required to subject the decision to proceed to a hearing. (But see Bus. & Prof. Code, § 17200 et seq.) Or the Division of Medical Quality of the Medical Board of California, having determined as a result of an investigation that charges should be brought against a physician for unprofessional conduct, would be required to provide the physician, under Lusardi's theory, with notice and an opportunity to be heard before an accusation could be brought. (But see Gov. Code, § 11500 et seq.; Bus. & Prof. Code, § 2220 et seq.) The examples could easily be multiplied.

The Director's decision that a project is a public work may lead to further action that triggers due process rights. Should the DLSE seek to recover underpayments of the prevailing wage from Lusardi in a court action under section 1775, Lusardi will be entitled to fully litigate the issue of its liability in the trial court. But at the time the Director's preliminary determination is made, no process is due.

### 5. *Coverage Determinations and Judicial Powers*

Lusardi argues that the Director's determination that a contract is a public work impermissibly intrudes on judicial powers under the standards set forth in *McHugh v. Santa Monica Rent Control Bd.* (1989) 49 Cal.3d 348 [261 Cal.Rptr. 318, 777 P.2d 91]. We do not agree.

In *McHugh v. Santa Monica Rent Control Bd., supra,* 49 Cal.3d 348, this court held that administrative agencies that are legislatively authorized to hold hearings and order relief may constitutionally do so when the exercise of such power is reasonably necessary to effectuate the agency's legitimate regulatory purposes, and "the 'essential' judicial power (i.e., the power to make enforceable, binding judgments) remains ultimately in the courts, through review of agency determinations." (*Id.,* at p. 372, italics omitted.)

Here, the Director's determination that a project is a public work does not violate the principles set forth in *McHugh v. Santa Monica Rent Control Bd., supra,* 49 Cal.3d 348. The Director's determination cannot be accurately characterized as "judicial," because it does not encompass the conduct of a hearing or a binding order for any type of relief.

### 6. *Lusardi Has Not Demonstrated Impermissible "Retroactive Enforcement" of the Prevailing Wage Law*

Lusardi argues that *any* application of the prevailing wage laws against it requiring the payment of higher wages to its employees on the Expansion

Project, or subjecting it to penalties for failing to comply with the prevailing wage laws, violates state and federal due process guarantees and amounts to impermissible "retroactive enforcement." Lusardi's theory, which the Court of Appeal found unnecessary to address, is that because the contract contained no provision requiring it to pay the prevailing wage, it had no notice of such a requirement. In support of this theory Lusardi relies on *Lambert* v. *California* (1957) 355 U.S. 225 [2 L.Ed.2d 228, 78 S.Ct. 240].

Lusardi's retroactive enforcement argument is premised on its contention that the obligation to pay prevailing wages arises solely from the contract. As shown above, however, this is incorrect; the obligation of a contractor to pay prevailing wages on a public work is statutory in nature.

In *Lambert* v. *California, supra,* 355 U.S. 225, the United States Supreme Court held that an ordinance making it a criminal offense for a person convicted of a felony to fail to register with a city if the person remained for more than five days in the city was unconstitutional as applied to a person who had no actual knowledge of the ordinance, when no showing was made of the probability of such knowledge. *Lambert* solely concerns the state of mind requisite to an individual's criminal liability. (*Texaco, Inc.* v. *Short* (1982) 454 U.S. 516, 537 fn. 33 [70 L.Ed.2d 738, 756, 102 S.Ct. 781]; see *United States* v. *Freed* (1971) 401 U.S. 601, 608-609 [28 L.Ed.2d 356, 362-363, 91 S.Ct. 1112].) Thus, it has no application here.

### 7. *Equitable Issues*

■ The Court of Appeal was persuaded that the doctrine of equitable estoppel bars the Director from determining that the Expansion Project was a public work. Lusardi renews that contention here, arguing that it relied on the District's representations that the project was not subject to the prevailing wage law, and that to now allow the Director to enforce the prevailing wage law against it would violate equitable principles. Not so.

■ Generally, four elements must be present for the doctrine of equitable estoppel to apply. First, the party to be estopped must have been aware of the facts. Second, that party must either intend that its act or omission be acted upon, or must so act that the party asserting estoppel has a right to believe it was intended. Third, the party asserting estoppel must be unaware of the true facts. Fourth, the party asserting estoppel must rely on the other party's conduct, to its detriment. (*Lentz* v. *McMahon* (1989) 49 Cal.3d 393, 398-399 [261 Cal.Rptr. 310, 777 P.2d 83].) ■ Even when these elements are present, estoppel will not be applied against the government if to do so would nullify a strong rule of policy adopted for the benefit of the

public. (*Ibid.*; accord, e.g., *City of Long Beach* v. *Mansell* (1970) 3 Cal.3d 462, 488 [91 Cal.Rptr. 23, 476 P.2d 423].)

Lusardi's attempt to invoke the doctrine against the Director must fail because the elements of equitable estoppel are entirely lacking against the Director. Lusardi does not and cannot claim that it justifiably relied on acts or omissions of the Director. Rather, Lusardi argues that the actions of the District led to Lusardi's reliance, and that the acts of the District should be attributed to the Director.

The acts of one public agency will bind another public agency only when there is privity, or an identity of interests between the agencies. (*City and County of San Francisco* v. *Grant Co.* (1986) 181 Cal.App.3d 1085, 1092 [227 Cal.Rptr. 154]; *California Tahoe Regional Planning Agency* v. *Day & Night Electric, Inc.* (1985) 163 Cal.App.3d 898, 904-905 [210 Cal.Rptr. 48]; see *Lerner* v. *Los Angeles City Board of Education* (1963) 59 Cal.2d 382, 397-399 [29 Cal.Rptr. 657, 380 P.2d 97].)

In this case, there is no privity or identity of interest between the District and the Director. Instead, there is a direct and palpable conflict. As its actions clearly evidence, the District had an interest in obtaining the lowest possible cost for construction of the hospital expansion project. The interest of the Director is in enforcing the prevailing wage laws. Contractors that do not pay the prevailing wage to their workers enjoy a competitive advantage over contractors that do, and may be preferred by local government agencies for public works projects, because the construction dollar will purchase more when a contractor paying less than the prevailing wage is selected. The facts of this case illustrate this conflict of interest: the District seeks to avoid the prevailing wage law, while the Director seeks to enforce it.

Lusardi argues that *Waters* v. *Division of Labor Standards Enforcement* (1987) 192 Cal.App.3d 635 [237 Cal.Rptr. 546] (hereafter *Waters*) supports a finding that the Director is estopped from determining that the project is subject to the prevailing wage law. We disagree.

In *Waters, supra*, 192 Cal.App.3d 635, a city published a notice for bids on a construction project stating that, under section 1773, prevailing wages were to be paid by the contractor, but failing to set forth the prevailing wage rates or to include a statement that the rates were on file with the city, as required by section 1773.2. The contractor consulted with a city architect, who mistakenly indicated that the prevailing rates for carpentry were considerably lower than the applicable rate established by the Director. Based on

this incorrect information, the contractor concluded that the rates paid by his carpentry subcontractor were greater than the prevailing wage. Thereafter, the DLSE determined that the carpenters had been underpaid; it levied a penalty for the underpayment, and ordered the city to withhold the amount of the underpayment plus the penalty from payments due the contractor. The contractor sued the DLSE. On appeal from a judgment in favor of the contractor, the appellate court held that although the contractor was liable for the underpayment, the DLSE was estopped by the actions of the city from collecting the penalty. (192 Cal.App.3d at pp. 639-642.)

The *Waters* court declined to apply estoppel to preclude enforcement of the prevailing wage law against the contractor, and held that the contractor was liable for the difference between the amount paid and the prevailing wage rate. (*Waters, supra,* 192 Cal.App.3d at p. 639.) Thus, *Waters* does not support an application of the doctrine of estoppel to preclude a determination that a project is a public work. Moreover, the *Waters* court never considered the question whether the city and the DLSE shared the requisite privity or identity of interests.

*Waters* does, however, contain an insight of considerable value to this case. The *Waters* court concluded that there was no "strong rule of policy" that would require the imposition of a penalty on the contractor, who had reasonably and in good faith attempted to comply with the requirements of the prevailing wage law. (*Waters, supra,* 192 Cal.App.3d at pp. 641-642.) We agree that in a proper case equitable considerations may preclude the imposition of statutory penalties against a public work contractor for failing to pay the prevailing wage. This is such a case. Here, Lusardi acted in good faith in entering into the contract on the basis of the District's representations, assertedly on the advice of its attorneys, that the project was not subject to the prevailing wage law. Under the circumstances of this case it would be inequitable for Lusardi to be held liable for penalties for failure to pay the prevailing wage. Lusardi's exposure to liability must be limited to the amount of underpayment.

This conclusion comports with this state's policy, reflected in Civil Code section 3275, that when a party incurs a loss in the nature of a forfeiture or penalty, but makes full compensation to the injured party, he or she may be relieved from the forfeiture or penalty except when there has been a grossly negligent, willful or fraudulent breach of a duty. California courts have applied this principle when necessary to accomplish substantial justice. (See *Valley View Home of Beaumont, Inc.* v. *Department of Health Services* (1983) 146 Cal.App.3d 161, 168 [194 Cal.Rptr. 56].) Similarly, courts refuse to impose civil penalties against a party who acted with a good faith and

reasonable belief in the legality of his or her actions. (*Whaler's Village Club v. California Coastal Com.* (1985) 173 Cal.App.3d 240, 263 [220 Cal.Rptr. 2]; *No Oil, Inc.* v. *Occidental Petroleum Corp.* (1975) 50 Cal.App.3d 8, 30 [123 Cal.Rptr. 589].) In this case substantial justice would not be achieved by a resolution that left Lusardi liable for statutory penalties under section 1775 for failing to pay the prevailing wage when it acted in good faith and on the express representations of a governmental entity. Based on these equitable principles, Lusardi should also not be liable for penalties under either section 1777.7 (relating to failure to comply with the apprenticeship provisions of the prevailing wage law) or section 1813 (involving noncompliance with overtime provisions of the prevailing wage law) based on violations allegedly occurring before Lusardi ceased work on the project in this case.

We also note in connection with the equitable issues raised in this case that although the contract between Imperial and the District specified that the prevailing wage was to be paid, the stipulation of the parties makes clear that the District expressly represented to Lusardi that the construction project was not a public work and therefore the prevailing wage law did not apply, and that Lusardi relied in good faith on these representations. These facts strongly suggest that Lusardi has remedies against the District, Imperial, and perhaps others for indemnification of any sums it may be required to pay as a result of application of the prevailing wage law. (See generally, *Rozay's Transfer* v. *Local Freight Drivers L.* (9th Cir. 1988) 850 F.2d 1321; *Southwest Administrators, Inc.* v. *Rozay's Transfer* (9th Cir. 1986) 791 F.2d 769.) Moreover, if the District made material misrepresentations to Lusardi, as the stipulated facts suggest, Lusardi may be entitled to recover for all other consequential damages it suffered as a result of such wrongful conduct, in addition to indemnification for amounts due under the prevailing wage law. (Civ. Code, § 3333.)

### 8. *Section 1776 Penalties*

Lusardi separately challenges numerous specific provisions of the prevailing wage law relating to penalties. The Court of Appeal did not reach Lusardi's specific challenges.

As described above, in May 1986 the DLSE directed Lusardi to submit certified payroll records and warned that failure to do so would subject Lusardi to statutory penalties. Lusardi did not comply with the request. In November 1986, the DLSE sent a "penalty assessment letter" to the District, with a copy to Lusardi. The letter purported to assess a statutory penalty of $25 per day per employee, under section 1776, subdivision (f), calculated on

the basis that there were a minimum of 200 employees, and made retroactive to August 30, 1986. The DLSE directed the District to withhold $380,000 from future progress payments due Lusardi, and to increase the amount withheld by $5,000 per day for each day of noncompliance beyond November 13, 1986.

Lusardi contends that the penalties imposed against it violate procedural due process guarantees because they constitute a deprivation of its property without a hearing. Lusardi also argues that section 1776, subdivision (f), violates the prohibition of unreasonable searches and seizures under the Fourth Amendment to the United States Constitution. We do not reach the merits of these arguments because, as we shall explain, the DLSE's letter purporting to impose the penalty was ineffective.

Under subdivision (f) of section 1776, a contractor has 10 days in which to comply with a request to submit certified payroll records. If the contractor fails to do so, the statute provides: "[T]he contractor shall, as a penalty to the state or political subdivision on whose behalf the contract is made or awarded, forfeit twenty-five dollars ($25) for each calendar day, or portion thereof, for each worker, until strict compliance is effectuated. Upon request of the [DAS] or the [DLSE], these penalties shall be withheld from progress payments then due."

In this case, there was no contract between Lusardi and the District. The only contract to which Lusardi was a party was the construction contract between it and Imperial. The District itself had no funds to withhold from Lusardi; thus, the DLSE's letter directing the District to withhold funds had no legal force.

Because the DLSE has taken no effective steps to impose a penalty on Lusardi under section 1776, subdivision (f), Lusardi is in the same position as if the DLSE had never asserted the applicability of that subdivision. In this context, a ruling on the constitutionality of section 1776, subdivision (f), would be purely advisory. We have no assurance that Lusardi would refuse to comply with a renewed request for records. Nor is there any reason to believe that the DLSE would necessarily seek penalties before affording Lusardi an opportunity to contest the matter in court. We decline to reach the questions regarding the constitutionality of section 1776 in this hypothetical context. (See *Hodel* v. *Virginia Surface Mining & Recl. Assn., supra,* 452 U.S. 264, 304 [69 L.Ed.2d 1, 33-34]; *Pacific Legal Foundation* v. *California Coastal Com.* (1982) 33 Cal.3d 158, 173-174 [188 Cal.Rptr. 104, 655 P.2d 306].)

### 9. *Additional Issues*

Lusardi argues that sections 1727 through 1733 are unconstitutional because they authorize the seizure of property without a hearing, and that sections 1775, 1777.7, and 1813 are unconstitutional because they provide for excessive penalties that are imposed without a hearing. As we have explained earlier, Lusardi is not liable for penalties under the latter three sections based on any violation allegedly occurring before it ceased work on the Expansion Project. Accordingly, we do not address Lusardi's contentions regarding these sections.

Sections 1727 through 1733 generally govern the circumstances under which awarding bodies may withhold sums from contractors, and provide for recovery of withheld sums. As noted above, here there was no contract between the contractor and the awarding body, and no sums were or could have been withheld from Lusardi by the District. The Director has not sought to apply any of these statutes against Lusardi. Under the circumstances, sections 1727 through 1733 are inapplicable. We decline to address the merits of legal questions not posed by the facts of this case.

### DISPOSITION

The judgment of the Court of Appeal is reversed.

Lucas, C. J., Mosk, J., and George, J., concurred.

**PANELLI, J., Concurring and Dissenting.**—I dissent from the majority's holding that the obligation of a contractor on a public works project to pay the prevailing wages arises from a statutory duty independent of any contractual agreement or notice to the contractor. (Maj. opn., *ante*, at pp. 986-988.) The majority bases its conclusion on the language of one of the public works law's provisions that the prevailing wage " 'shall be paid to all workers employed on public works.' " (*Id.* at p. 987, italics omitted, quoting Lab. Code, § 1771.)[1] The majority also asserts that requiring contractors to comply with the public works laws only when their contracts require it would defeat the legislative objective of ensuring that workers on public works be paid the prevailing wages. (Maj. opn., *ante*, at p. 987.) I disagree with the majority's interpretation of the prevailing wage laws. In my view, the statutory scheme as a whole does not disclose a legislative intent to hold contractors liable for paying the prevailing wages when the contract does not require those wages to be paid; rather, it reflects a view that the Legislature intended contractors to be aware of their obligations under the prevailing

---

[1]All further statutory references are to the Labor Code unless otherwise noted.

wage laws before entering into a contract for public works. As a consequence, the result that the majority in this case reaches is patently unfair and, in my view, unconstitutional as a violation of due process; there is no evidence that the Legislature intended such a result.

In interpreting the prevailing wage laws, we must look at the statutory scheme as a whole in order to harmonize the various elements. (*Mattice Investments, Inc.* v. *Division of Labor Standards Enforcement* (1987) 190 Cal.App.3d 918, 923 [235 Cal.Rptr. 502]; *Bowland* v. *Municipal Court* (1976) 18 Cal.3d 479, 489 [134 Cal.Rptr. 630, 556 P.2d 1081].) While it is true, as the majority states, that section 1771 provides that the prevailing wage "shall be paid to all workers employed on public works," it is also evident that the statutory scheme establishes detailed procedures designed to ensure that contractors are aware of their responsibilities under the public works laws before entering into a public works contract. (See §§ 1773.2, 1775, 1776, subd. (g), 1777.5.) In particular, the public body awarding the contract is required either to specify the prevailing wage in the call for bids, the bid specifications, and the contract itself, or to include a statement in those documents that copies of the prevailing rate of wages are on file and available for inspection. (§ 1773.2.) In addition, the awarding public body is required to have the contract include a stipulation that the contractor will comply with the forfeiture and penalty provisions if any workers employed by the contractor or any subcontractor are underpaid. (§ 1775.)

These provisions for precontract notice indicate that the Legislature intended contractors to be fully aware of their responsibility to pay the prevailing wages and of the consequences of failure to pay those wages before entering into a contract for the construction of public works. The Legislature also intended contractors to agree to those obligations in the contract. The statutory scheme can most reasonably be read to allow the prevailing wage laws to be enforced against the contractor only when the contract specifies that the project is a public work. The *stipulated* facts in this case indicate that Lusardi Construction Company's (Lusardi's) contract did not state that the prevailing wage laws were applicable; in fact, Lusardi's representative made clear that the company would not enter the contract if it was for a public works project. I do not believe that the Legislature intended contractors to be held liable for the prevailing wages under these factual circumstances.

This interpretation is consistent with that of the Courts of Appeal that have considered the question of when a contractor can be required to pay prevailing wages on a public works project. As will be discussed, those courts have held without exception, that the contractor could be held liable because, *in*

*each case, the contractor had agreed in the contract to be subject to the prevailing wage laws.*

In *Division of Lab. Stds. Enforcement* v. *Ericsson Information Systems, Inc.* (1990) 221 Cal.App.3d 114 [270 Cal.Rptr. 75], the Court of Appeal held that a contractor could be required to pay the prevailing wage to workers who fell into a job classification for which the public entity awarding the contract had not specified the prevailing wage. The court reasoned that this deficiency did not relieve the contractor of its obligation to pay all its workers prevailing wages, because *the contractor had expressly agreed in the contract to pay prevailing wages.* (*Id.* at pp. 125-126 & fn. 21.)

Two cases in which payments were withheld from contractors after the contractors failed to ensure that prevailing wages were paid also conclude that the duty to pay prevailing wages arises from the contract. In *O. G. Sansone Co.* v. *Department of Transportation* (1976) 55 Cal.App.3d 434 [127 Cal.Rptr. 799] the court held that contractor could be required to pay penalties and the difference between actual wages and the prevailing wage rate when a subcontractor failed to pay the prevailing wages. The court reasoned that the public works provisions of the Labor Code did not place an involuntary burden on the contractor, since "[the contractors'] execution of the contract with knowledge of the penalties to be imposed if they or their subcontractors failed to pay the prevailing wages required under the contract was voluntary, and constituted consent to the [prevailing wage provisions]. [Citation.]" (*Id.* at p. 455.) Therefore the court held that "[w]hen the contractor submits his bid *based on the prevailing wage determination* and freely enters into a contract for the public work involved, *in which contract he stipulates to be subject to the penalty provisions of the prevailing wage law,* he cannot be heard to say that he was denied due process of law with respect to the enforcement of the penalty provisions." (*Ibid.*, italics added.)

The court in *Waters* v. *Division of Labor Standards Enforcement* (1987) 192 Cal.App.3d 635 [237 Cal.Rptr. 546] (*Waters*), applied a similar analysis. There, the contracting public entity withheld payments from a contractor to cover penalties and extra wages when a subcontractor failed to pay the prevailing rate. The city contracting for the project had not specified what the prevailing rates were, nor that those rates were on file in the city's office. However, the contract between the city and Waters, the contractor, did provide that the prevailing wage rates were to be paid to the workers. The court held that Waters could be required to pay the difference between the prevailing rates and the wages actually paid, *because "[t]he contract documents . . . did alert Waters, as he so testified, that the wages must not be less*

*than the prevailing general rate.*" (*Id.* at p. 640, italics added.)[2] The court stated, "[w]hen a contractor freely enters into an agreement for a public work in which he stipulates to pay the prevailing wage rate . . . , he will be required to comply with the terms of his contract." (*Id.* at p. 639.)

Thus, the courts that have considered the applicability of the requirement to pay prevailing wages in circumstances in which the public entity did not fully comply with its obligations agree that "*the duty to pay the prevailing wage [is] triggered once the contractor so agree[s] in the contract.*" (*Division of Lab. Stds. Enforcement* v. *Ericsson Information Systems, Inc., supra,* 221 Cal.App.3d at p. 126, fn. 21, italics added.) Under this analysis, a contractor is not liable for paying prevailing wages or for any penalties for underpayment unless the contractor was on notice of the requirements at the time that the contractor entered into the contract for the public work and agreed to pay the prevailing wages in the contract. I believe that this conclusion is correct.

Under the majority's interpretation, a contractor may be held liable for extra wages although the contractor had no notice that the prevailing wage requirements would be applicable and, like Lusardi, the contractor would not have entered into the contract if the contractor had had that notice. In that case, if a contractor enters into a contract in a good faith belief that it is for a private work, *as the stipulated facts state that Lusardi did,* and the project is later determined to be a public work, the contractor would effectively have been forced against its will into accepting a public works contract. To say that the contractor will only be liable for the extra wages and not for any penalties does not mitigate the fundamental unfairness of this outcome. I see no reason to conclude that the Legislature intended such an unfair result. (See *County of Madera* v. *Gendron* (1963) 59 Cal.2d 798, 803 [31 Cal.Rptr. 302, 382 P.2d 342, 6 A.L.R.3d 555] [court reluctant to construe statute in a way that would cause "harsh and unjust result" in the absence of "clear indication" of legislative intent]; see also *Johnson* v. *Workers' Comp. Appeals Bd.* (1984) 37 Cal.3d 235, 242 [207 Cal.Rptr. 857, 689 P.2d 1127].)

The majority attempts to soften the harshness of its holding by saying that Lusardi may be entitled to indemnity from the Tri-City Hospital District (the District). In my view, the fundamental unfairness remains. The majority's conclusion would place on Lusardi the primary responsibility for paying the excess wages, as well as the additional burden of showing that it was entitled to indemnity. This is a considerable burden to place on a contractor that, as the stipulated facts state, relied in good faith on the District's assurances that the expansion project was a private work.

---

[2]It also held that, under the doctrine of equitable estoppel, Waters could not be required to pay the statutory penalties because he had made a reasonable attempt to find out what the prevailing wages were. (*Waters, supra,* 192 Cal.App.3d at pp. 640-641.)

I am also troubled by the due process implications of the majority's conclusion imposing liability on Lusardi. In this case, the Director of the Department of Industrial Relations (the Director), after the contract was entered into, made a determination that the project was a public work and directed the District to withhold payments due Lusardi. The majority concludes that this action did not result in a deprivation of property without due process of law, since there was no money due from the District to Lusardi, but rather, all money due Lusardi was owed by Imperial Municipal Services Group, Inc. (Imperial). Accordingly, under the majority's view, the Director would have had to institute a court action, giving Lusardi notice and an opportunity to be heard before any deprivation of its property occurred. (Maj. opn., *ante*, at pp. 990-993; see § 1775.)

This reasoning, in my view, is unsound. The contract between the District and Imperial stated that "[Imperial] hereby appoints and constitutes [the District] as its agent and attorney-in-fact for all purposes respecting construction of the [expansion project], including, without limitation, the engagement of contractors . . . and the management and supervision of the construction of the [expansion project] . . . . [The District], as agent, shall . . . supervise and provide for, or cause to be supervised and provided for, as agent for [Imperial], the complete acquisition and construction of the [expansion project]." Thus, the District had complete responsibility for managing the construction of the project. Moreover, the majority concludes that as the agent of Imperial, the District is the "awarding body."

If the District is the "awarding body," it elevates form over substance to say that there was no money owing from the District to the contractor. If the District did owe money to Lusardi, then the Director would not have ordered an "impossible act" when he ordered the District to withhold funds from Lusardi. (See maj. opn., *ante*, at p. 991.) This withholding of funds would clearly violate Lusardi's due process rights, since the contractor would have been deprived of its property without notice or an opportunity to be heard. (See *O. G. Sansone Co.* v. *Department of Transportation, supra,* 55 Cal.App.3d at p. 455.)

The majority has expressed concern that if contractors cannot be bound by the public works laws in the absence of agreement in the contract, the policy of ensuring that workers are paid the prevailing wage will be defeated. However, I do not see any state policy that can only be served by holding contractors liable in these circumstances. The Legislature has seen fit to place on the contracting *public entities* the obligation to require public works contractors to pay the prevailing wages. "By the express terms of the statutes, the Legislature has imposed upon the awarding body . . . the responsibility for providing advance notice to the contractor that wages must

be paid in accordance with the general prevailing rate . . . . [Citation.]" (*Waters, supra,* 192 Cal.App.3d at p. 640.) The statutory objective of guaranteeing that workers on public works are paid prevailing wages can be served by requiring public entities to carry out their obligations under the public works law.

Enforcing the public works laws against awarding bodies only and not against the contractors in these circumstances would be both reasonable and fair. The public works law imposes a duty *on the public agency* to put bidders on notice of the potential liability that a successful bidder will incur. Nowhere does the public works law suggest that bidders not notified of the implications of a successful bid will nonetheless be subject to an obligation imposed upon them after the fact, resulting from the failure of a public agency to follow the dictates of the law. Nor would it be unreasonable to place upon the public agency itself the financial burden of its failure to comply with the public works law. By not adhering to its obligation under the law, the public agency is, presumptively, the beneficiary of a less costly project; had the public agency advised bidders of their obligations under the public works law to pay prevailing wages the project would have been more costly to the public agency. Hence it would not be unfair to require the public agency to bear any obligation to pay the extra wages.

The majority has also raised the possibility that, if contractors are not held liable in these circumstances, public entities and contractors might collude to evade the prevailing wage laws. However, the statutory scheme provides criminal sanctions that will serve to discourage collusion. Section 1777 makes it a misdemeanor for any officer, agent, or representative of the state or any political subdivision to wilfully violate any provision of the prevailing wage law statutory scheme. I presume that collusion with a contractor to evade the laws would fall under this section.

Therefore, I dissent from the majority's conclusion that contractors' obligation to pay the prevailing wages arises purely from the statutory scheme. In my view, Lusardi cannot be required to pay the difference between the prevailing wages and the wages actually paid because it did not have notice that the prevailing wage laws applied before entering into the contract to construct the expansion project and did not agree in the contract to pay those wages. Like the majority, I also conclude that Lusardi cannot be required to pay the statutory penalties.

Baxter, J., concurred.

**ARABIAN, J.,** Concurring and Dissenting.—Although I agree that the obligation to pay prevailing wage derives from statute as well as contract

and that the Director of the Department of Industrial Relations (the Director) retains the inherent and necessary authority ultimately to determine a project's public work status, I cannot support the majority's refusal to accord Lusardi Construction Company (Lusardi) a modicum of fairness under this scenario. In my view, the circumstances "clearly establish that a grave injustice would be done if an equitable estoppel were not applied." (*Cal. Cigarette Concessions* v. *City of L. A.* (1960) 53 Cal.2d 865, 869 [3 Cal.Rptr. 675, 350 P.2d 715].) I would, therefore, affirm the judgment of the Court of Appeal.

The stipulated facts establish that the contract between Lusardi and Imperial Municipal Services Group, Inc. (Imperial) did not contain any reference to the status of the expansion project as a public work or to any obligation to pay prevailing wages; that Lusardi inquired as to the nature of the project, expressly declining to enter into a public works contract; that in response the Tri-City Hospital District (the District) gave assurances, based on representations of its legal counsel, that the construction was private and no prevailing wage or payroll record obligations obtained; that Lusardi premised its agreement with Imperial upon those assurances and representations; and that in so doing Lusardi acted in good faith. Lusardi did all a business could do.

A simple recitation of these facts should thus suffice to confirm the right to invoke equitable estoppel: Lusardi acted to its detriment in justifiable reliance upon the inaccurate representations of a governmental agency charged with implementation and enforcement of the law. Nevertheless, the majority demur based upon an asserted lack of privity between the Director and the District and the potential nullification of "a strong rule of policy adopted for the benefit of the public." (Maj. opn., *ante*, pp. 994-995.)

To reach its conclusion, the majority analysis hews to the "elements" of equitable estoppel. (See *City of Long Beach* v. *Mansell* (1970) 3 Cal.3d 462, 489 [91 Cal.Rptr. 23, 476 P.2d 423].) Dispensing equitable relief, however, depends upon a measure of flexibility as well as fairness and must accommodate compelling circumstances that may not precisely conform to "the rigid rules of law." (*Bechtel* v. *Wier* (1907) 152 Cal. 443, 446 [93 P. 75].) "Equity does not wait upon precedent which exactly squares with the facts in controversy, but will assert itself in those situations where right and justice would be defeated but for its intervention." (*Times-Mirror Co.* v. *Superior Court* (1935) 3 Cal.2d 309, 331 [44 P.2d 547]; *Bisno* v. *Sax* (1959) 175 Cal.App.2d 714, 729 [346 P.2d 814] [" 'no inflexible rule has been permitted to circumscribe the power of equity to do justice' "]; cf. *Farina* v. *Bevilacqua* (1961) 192 Cal.App.2d 681, 685 [13 Cal.Rptr. 791] [inability to restore precise status quo not invariable bar to rescission]; *Nadell & Co.* v. *Grasso*

(1959) 175 Cal.App.2d 420, 431 [346 P.2d 505] ["peculiar, and perhaps unique, facts" justified enforcement of restrictive covenant as to services; equitable servitudes not limited to chattels].)

Moreover, I am unpersuaded under the facts that equity should not charge the Director with the consequences of the District's conduct. As head of the Department of Industrial Relations, the Director assumes primary responsibility for determining, monitoring, and enforcing prevailing wage laws on public works. (See generally Lab. Code, § 1770 et seq.) The awarding body has interrelated notification and implementation obligations pursuant to which it works in conjunction with the Director to ensure compliance. (See, e.g., Lab. Code, §§ 1773.2, 1773.3, 1773.4, 1775, 1776; cf. *City and County of San Francisco* v. *Grant Co.* (1986) 181 Cal.App.3d 1085, 1092 [227 Cal.Rptr. 154] [city not acting as arm or agent of state in failing to enforce building code regulations since city had initial and independent enforcement responsibility within its territory].) The statutory scheme thus contemplates a confluence of governmental interests and duties sufficient in my estimation to establish privity. (See *Lerner* v. *Los Angeles City Board of Education* (1963) 59 Cal.2d 382, 397-399 [29 Cal.Rptr. 657, 380 P.2d 97], and cases cited at fn. 10.) In finding to the contrary, the majority rely on the fact that the District in actuality assumed a position antagonistic to the Director. Lusardi, however, had no reason to anticipate such an eventuality, whereas the Director could well have taken measures to forestall the possibility. (See Lab. Code, § 1773.5 [Director may "establish rules and regulations for the purpose of carrying out this chapter, including, . . . the responsibilities and duties of awarding bodies"].) Lusardi should not bear the burden of the Director's default in failing to maintain adequate administrative controls over awarding bodies that share responsibility for implementing and enforcing prevailing wage laws.[1]

Furthermore, the Director retains the inherent authority to characterize a given project as a public work thereby invoking the obligation to pay

---

[1]Whether based on equity or otherwise, this court does not lack precedent for holding one governmental agency accountable for the actions of another. (See, e.g., *People* v. *Sims* (1982) 32 Cal.3d 468, 481-482 [186 Cal.Rptr. 77, 651 P.2d 321] [criminal charges of welfare fraud dismissed on collateral estoppel after evidence found insufficient in administrative hearing; "The People cannot now take advantage of the fact that the County avoided its litigation responsibilities and chose not to present evidence at the prior proceeding."]; *Kellett* v. *Superior Court* (1966) 63 Cal.2d 822, 827-829 [48 Cal.Rptr. 366, 409 P.2d 206] [under Pen. Code, § 654, misdemeanor conviction will generally bar felony prosecution based on same act or course of conduct even when crimes are prosecuted by different public law offices]; *Lucido* v. *Superior Court* (1990) 51 Cal.3d 335, 351-352 [272 Cal.Rptr. 767, 795 P.2d 1223, 2 A.L.R.5th 995] [for reasons of public policy collateral estoppel does not preclude criminal prosecution after People fail to establish violation of probation based on same underlying conduct].)

prevailing wages. (Maj. opn., *ante*, pp. 988-989.) Accordingly, at any and all times the Director could have intervened, notified Lusardi that the project constituted a public work, and mandated wage and reporting compliance. Cynically, I note such intervention did not occur until Lusardi had substantially completed the project in reliance upon contractual provisions and express representations by a governmental agency to the contrary. "[N]egligence or silence in the face of a duty to speak may suffice [to invoke estoppel]. [Citation.]" (*City and County of San Francisco v. Grant Co., supra,* 181 Cal.App.3d at p. 1091; see also *Dettamanti v. Lompoc Union School Dist.* (1956) 143 Cal.App.2d 715, 721 [300 P.2d 78]; cf. *People v. Department of Housing & Community Dev.* (1975) 45 Cal.App.3d 185, 195-196 [119 Cal.Rptr. 266] [comparing estoppel and laches]; 11 Witkin, Summary of Cal. Law (9th ed. 1990) Equity, § 14, pp. 690-692 [defense of laches].) While the District's misfeasance may have instigated this predicament, the Director's nonfeasance perpetuated it to Lusardi's detriment.

As to the majority's policy argument, I cannot agree that the Legislature enacted the prevailing wage laws "for the benefit of the public." (See *County of San Diego v. Cal. Water etc. Co.* (1947) 30 Cal.2d 817, 826-828 [186 P.2d 124, 175 A.L.R. 747].) Whatever incidental salutary effect the general public may derive, in the words of the majority, "[t]he overall purpose of the prevailing wage law is to protect and benefit employees on public works projects." (Maj. opn., *ante,* p. 985; see Lab. Code, § 90.5, subd. (a); *O. G. Sansone Co. v. Department of Transportation* (1976) 55 Cal.App.3d 434, 458 [127 Cal.Rptr. 799]; cf. 11 Witkin, Summary of Cal. Law, *supra,* Equity, § 183, at pp. 864-866, and cases cited therein ["no estoppel where it would defeat operation of a policy protecting the public"].) As between the two, the District, not Lusardi, had the primary statutory obligation to safeguard the interests of employees with respect to minimum labor standards. (See Lab. Code, § 1720 et seq.) Indemnification notwithstanding, I see no public policy fostered by requiring a nondefaulting party to assume that responsibility.[2] (*Waters v. Division of Labor Standards Enforcement* (1987) 192 Cal.App.3d 635, 641-642 [237 Cal.Rptr. 546].)

As the Court of Appeal below summarized, "We have here a fact situation which shouts estoppel." If no equitable mechanism exists by which Lusardi can extricate itself from the very litigation it attempted in good faith to avoid, then rectitude and fair dealing have ceased to function within our judicial framework. Regrettably, the chancellor's conscience has fallen victim to the very rigidity of the rule of law it should seek to ameliorate. (See

---

[2]In no respect do the facts imply a case of unjust enrichment or an unfair profit by Lusardi at the expense of employees who may otherwise have been entitled to a higher wage. Lusardi and the District premised their negotiations and the final terms of the contract on the absence of any prevailing wage obligations.

*Bechtel* v. *Wier, supra,* 152 Cal. 443, 446; *City of Los Angeles* v. *Cohn* (1894) 101 Cal. 373, 376-378 [35 P. 1002].)

**BAXTER, J.,** Concurring and Dissenting.—I agree with the majority that Lusardi Construction Company (Lusardi) cannot be held liable for statutory penalties. I respectfully dissent, however, from the remainder of the judgment and the majority's reasoning. I have concurred in Justice Panelli's explanation of why Lusardi should not be required to pay the difference between the prevailing wages and the wages that Lusardi contracted to pay. (Conc. and dis. opn. of Panelli, J., at pp. 999-1004, *ante.*) I write separately only to state that I also agree with Justice Arabian's conclusion that the majority opinion results in a miscarriage of justice. (Conc. and dis. opn. of Arabian, J., at pp. 1004-1008, *ante.*) As he explains and as the Court of Appeal observed, this case cries out for application of equitable estoppel.

In an apparent attempt to render its harsh result more palatable, the majority suggests that Lusardi "has remedies against the District, Imperial, and perhaps others for indemnification . . . ." (Maj. opn., at p. 997, *ante.*) This result not only delays justice to Lusardi, it unnecessarily consumes court resources.