[No. A115656. First Dist., Div. Three. Dec. 11, 2007.]

PLUMBERS AND STEAMFITTERS, LOCAL 290, Plaintiff and Respondent, v.
JOHN DUNCAN, as Director, etc., Defendant and Appellant;
KRAMER PROPERTIES, INC., et al., Real Parties in Interest and Respondent.

1084

**COUNSEL**

Department of Industrial Relations, Vanessa L. Holton and Christopher G. Jagard for Defendant and Appellant.

Davis, Cowell & Bowe, John J. Davis, Jr., Andrew J. Kahn and Eric B. Myers for Plaintiff and Respondent.

No appearance for Real Parties in Interest and Respondent.

**OPINION**

**POLLAK, J.**—Plaintiff Plumbers and Steamfitters, Local 290 (Local 290) petitioned the superior court for a writ of mandate seeking to vacate a decision by John Rea, the then Acting Director of the Department of Industrial Relations (collectively, the department), that renovation performed by real party in interest Cruz Plumbing, Inc. (Cruz), of a building owned by real party in interest Kramer Properties, Inc. (Kramer), and leased in part to Humboldt County (the county) was not a public works project under California's prevailing wage law (Lab. Code, § 1720 et seq.).[1] The court granted relief, finding that the project qualifies as public work under section 1720.2. The court also awarded Local 290 attorney fees under Code of Civil Procedure section 1021.5. The department appeals, challenging both the issuance of the writ and the award of attorney fees. We shall affirm the judgment in its entirety.

### Factual and Procedural Background

The facts are undisputed. In April 2000, Kramer purchased a professional building at 507 F Street in Eureka, California. On January 14, 2003, Kramer

---

[1] All statutory references are to the Labor Code unless otherwise noted.

leased to the county 25,595 square feet of office space, or 63 percent of the total assignable square footage of the building. The county agreed to pay $1.79 per square foot in monthly rent, 30 cents of which was earmarked for "compliance with the prevailing wage." Section 1.3.1 of the lease provides, "Landlord acknowledges and agrees that all work on building modifications performed by landlord at the request of tenant, as specified in exhibit C, shall be governed by and performed in accordance with the provisions of [the prevailing wage law]." Exhibit C, entitled "Leasehold Improvement Agreement," consists of two sections: section 1, governing "Construction of Building," and section 2, governing "Design and Construction of Premises." Section 1 requires Kramer to construct, at its sole cost, "utility services to the building, including water, sewer, gas, . . . a minimum of one restroom core to serve at least 200 employees in accordance with the California Plumbing Code, . . . sewer and water laterals and underground drainage systems . . . and other improvements and costs pursuant to the building plans and specifications." Section 2, which pertains to improvements within the county-occupied office space, requires Kramer to install, among other things, general plumbing, drains and water coolers.

On March 28, 2003, Kramer entered into two separate contracts with Cruz. One contract pertains to performance of the plumbing improvements within the county-occupied office space required by section 2 of exhibit C to the county's lease (the tenant improvement contract). The other contract pertains to plumbing work for the building improvements required under section 1 of exhibit C (the shell improvement contract). Kramer acknowledges that Cruz was required to pay prevailing wages for work performed under the tenant improvement contract, and Local 290 does not dispute that Kramer did so. Cruz did not, however, pay prevailing wages on plumbing work performed under the shell improvement contract.

On January 6, 2004, at the request of Local 290, the former director of the department issued a public works coverage determination finding that the shell improvement contract relates to a public work under section 1720.2, so that Cruz was required to pay prevailing wages for work performed under that contract. Kramer appealed the coverage determination and on June 8, 2005, the then acting director issued a decision on administrative appeal reversing the prior determination.

Local 290 filed a petition for a writ of mandate against the department seeking to vacate the acting director's decision, and the trial court granted the petition. Thereafter, the trial court granted Local 290's motion for attorney fees under Code of Civil Procedure section 1021.5. The department filed a timely notice of appeal.

## Discussion

### 1. *Petition for Writ of Mandate*

■ "Section 1771 requires that 'workers employed on public works' be paid 'not less than the general prevailing rate of per diem wages for work of a similar character in the locality in which the public work is performed . . . .' " (*City of Long Beach v. Department of Industrial Relations* (2004) 34 Cal.4th 942, 946 [22 Cal.Rptr.3d 518, 102 P.3d 904].) " 'The overall purpose of the prevailing wage law is to protect and benefit employees on public works projects.' " (*Id.* at p. 949, italics omitted, quoting *Lusardi Construction Co. v. Aubry* (1992) 1 Cal.4th 976, 985 [4 Cal.Rptr.2d 837, 824 P.2d 643].) "The Legislature has declared that it is the public policy of California 'to vigorously enforce minimum labor standards in order to ensure employees are not required or permitted to work under substandard unlawful conditions, and to protect employers who comply with the law from those who attempt to gain competitive advantage at the expense of their workers by failing to comply with minimum labor standards.' " (*Lusardi Construction Co. v. Aubry, supra,* at p. 985.)

Under section 1720.2 the definition of "public works" is expanded to include "any construction work done under private contract when all of the following conditions exist: [¶] (a) The construction contract is between private persons. [¶] (b) The property subject to the construction contract is privately owned, but upon completion of the construction work, more than 50 percent of the assignable square feet of the property is leased to the state or a political subdivision for its use. [¶] (c) Either of the following conditions exist: [¶] (1) The lease agreement between the lessor and the state or political subdivision, as lessee, was entered into prior to the construction contract. [¶] (2) The construction work is performed according to plans, specifications, or criteria furnished by the state or political subdivision, and the lease agreement between the lessor and the state or political subdivision, as lessee, is entered into during, or upon completion of, the construction work." The department contends that the trial court erred in concluding that the plumbing work performed under the shell improvement contract was a public work within the meaning of section 1720.2.

In conducting our review, we exercise our independent judgment in resolving whether the project at issue constituted a public work within the meaning of section 1720.2. (*McIntosh v. Aubry* (1993) 14 Cal.App.4th 1576, 1583–1584 [18 Cal.Rptr.2d 680] ["public-works coverage determinations . . . *entail interpretations of section 1720* . . . : 'Interpretation or construction of a statute is a matter of law; not the exercise of discretionary authority' "]; see also *Greystone Homes, Inc. v. Cake* (2005) 135 Cal.App.4th 1, 8 [37

Cal.Rptr.3d 183].) While we must give careful consideration to the department's interpretation of section 1720.2, we are not bound by this interpretation, as the interpretation of a statute is ultimately a judicial function. (*City of Long Beach v. Department of Industrial Relations, supra,* 34 Cal.4th at p. 951 ["although we give the Department's interpretation great weight [citation], this court bears the ultimate responsibility for construing the statute"]; *Agnew v. State Bd. of Equalization* (1999) 21 Cal.4th 310, 322 [87 Cal.Rptr.2d 423, 981 P.2d 52], quoting *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7 [78 Cal.Rptr.2d 1, 960 P.2d 1031] ["When an administrative agency construes a statute in adopting a regulation or formulating a policy, the court will respect the agency interpretation as one of several interpretive tools that may be helpful. In the end, however, '[the court] must . . . independently judge the text of the statute' "].)

The department acknowledges that "the elements of section 1720.2 (a), (b), and (c)(1) are satisfied in that the shell improvement contract between [Kramer] and Cruz is between private persons, the building is privately owned; and upon completion of the construction work, [the] county will lease approximately 63 percent of the assignable square feet, and the March 28, 2003, shell improvement contract between [Kramer] and Cruz was executed after the January 14, 2003 lease agreement between [Kramer] and [the] county." The department argues that the shell improvement contract nonetheless is not for public work because section 1720.2 is applicable only to new construction and not to the renovation of an existing building. Alternatively, it argues that even if section 1720.2 is applicable to renovations, the phrase "any construction work" must be construed to mean only that portion of the project that involves work in the publicly leased space.

 Nothing in the language of the statute or the legislative history supports the interpretation that section 1720.2 applies only to the construction of a new building. The definition of public works in section 1720.2 includes "any construction work" when certain conditions are met. The plain meaning of the term "construction" includes not only the erection of a new structure but also the renovation of an existing one. (See *TRB Investments, Inc. v. Fireman's Fund Ins. Co.* (2006) 40 Cal.4th 19, 28 [50 Cal.Rptr.3d 597, 145 P.3d 472] ["there is no doubt that the term 'construction,' as commonly understood, includes the building of a new structure. . . . [H]owever, the 'plain meaning' of that term would not seem to exclude other types of building endeavors short of erecting a new structure, such as substantial improvements or modifications to an existing structure, including projects that transform a hovel into a mansion, raze and replace the entire interior of a structure, or otherwise fundamentally transform a building"]; *Priest v. Housing Authority of Oxnard* (1969) 275 Cal.App.2d 751, 756 [80 Cal.Rptr. 145] ["construction" as used in § 1720 includes "the entire process, including construction of basements, foundations, utility connections and the like, all of

which may be required in order to erect an above-ground structure"].) As the trial court observed, the language of the statute is clear and unambiguous.

The limited legislative history cited in the department's brief does not demonstrate any ambiguity and is consistent with the trial court's interpretation. As the department explains, section 1720.2 was enacted after concerned legislators learned that a privately owned facility in Napa was being built for lease to a public agency by less expensive workers from Los Angeles. As stated in the "report to the Senate Committee on Industrial Relations describing Assembly Bill No. 3235" cited by the department, the purpose of the bill was to "require the payment of prevailing wages when a public agency leases 50% or more of the assignable space of the completed building." This statement does not imply that the Legislature intended to limit the scope of the provision to instances of new construction. Neither is such a limitation found in the enrolled bill report on Assembly Bill No. 3235 (1973–1974 Reg. Sess.) prepared by the Department of Water Resources, which recites that under the bill "a building constructed privately for the express purpose of being leased to the State or a governmental entity is in effect a state building. Appropriately, its construction should come within the prevailing wage law." Like the trial court, we find no basis in these statements to differentiate between a building newly constructed for the purpose of being leased to a public entity and a building substantially renovated for that same purpose.

While the department urges the court to give deference to its interpretation of section 1720.2, we do not perceive any ambiguity in the term "construction" that leaves room for the exercise of interpretive discretion to which the court should defer. Moreover, we note that the interpretation the department now urges is contrary to its position in a prior prevailing wage case. (Public Works case No. 91-037 (Apr. 20, 1992) 2424 Arden Way, Sacramento, Speiker Partners Lease.) In that case, the department expressly rejected the argument made here that "the bill creating Labor Code § 1720.2 (AB 3235 by Assemblyman Dunlap) was meant only to cover construction of a completed building and not alterations." (*Id.* at p. 14.) The department explained that the legislative history offered in support of that claim did not "actually address[] the question which Lessor claims that they answer. They merely refer to construction projects generally, and do not define the term in any manner. The legislative history which Lessor has pressed is simply unpersuasive." (*Id.* at p. 15.) While the department now emphasizes that the work at 2424 Arden Way was all within space leased to the public agency, the department's extended analysis in that case was not dependent on that fact. Ultimately the department concluded that the distinction between building rehabilitation and

new building construction makes "little sense" because "[a] 'gut rehabilitation' job extending over several months like 2424 Arden Way uses construction labor, and has an effect on the local labor market, as much as building from the ground up." (*Id.* at p. 16.) We agree with this earlier interpretation by the department.

The department's alternate argument is that if section 1720.2 applies to renovation work, the language "any construction work" must be read as limited to work in areas actually leased by the county. It argues, "Examining the entire section in context, the 'public work' created under section 1720.2 is predicated on a relationship between the construction work and the public entity lease. Where there is no relationship between the construction and the public entity lease, there is no public work. [¶] The trial court interpreted (c)(1) too broadly in concluding that section 1720.2's reference to 'any construction' includes work performed on non-publicly leased portions of the building shell." (Fn. omitted.) This argument too ignores the unambiguous language of the statute and the Legislature's clear directive that a project be considered a public work if a public entity leases "more than 50 percent of the assignable square feet of the property." (§ 1720.2, subd. (b).) The "property" to which this subdivision refers is the entire structure, not simply the space that is subject to the lease. This is clear from the first requirement of section 1720.2, subdivision (b), that "[t]he property subject to the construction contract is privately owned," which clearly refers to ownership of the entire building. The department's interpretation would render the "more than 50 percent" requirement meaningless, since an agency necessarily leases 100 percent of the space that it leases. The legislative history confirms that the Legislature intended to create a bright-line rule for determining when construction on a privately owned building qualifies as a public works project. When Assembly Bill No. 3235 (1973–1974 Reg. Sess.) was originally introduced, section 1720.2, subdivision (b) required only that the property "be leased to the state or a political subdivision." (Assem. Bill No. 3235 (1973–1974 Reg. Sess.) as introduced Feb. 25, 1974.) Section 1720.2, subdivision (b) was initially amended to require that the property "be *primarily* leased to the state or a political subdivision" (Assem. Amend. to Assem. Bill No. 3235 (1973–1974 Reg. Sess.) Apr. 1, 1974), but was later amended to require that "more than 50 percent of the assignable square feet of the property [be] leased to the state or a political subdivision" (Assem. Amend. to Assem. Bill No. 3235 (1973–1974 Reg. Sess.) Apr. 29, 1974). Both the language and the legislative history of the provision thus confirm a legislative determination that construction work performed on a property that is mostly leased by a public agency should be considered public work for purposes of the prevailing wage law.

Assuming, without deciding, that the statute may plausibly be read to exclude construction work within a structure that has no functional relationship to space leased to a public agency—installation of a coffee shop in the building is the hypothetical posed by the department—that is not the situation here. We cannot agree that there is no functional relationship between the work performed under the shell improvement contract and the space leased to the county. The department argues that "[t]he plumbing work performed under the shell improvement contract was part of an ongoing undertaking by [Kramer] to renovate and rehabilitate an 83-year-old building and make it suitable for occupancy by tenants other than [the] county. It bears no relationship to the county lease." The external plumbing work, however, unquestionably is essential to the operation of the internal plumbing in the county-occupied areas of the building. The fact that the rough plumbing may also benefit other tenants does not negate the functional relationship between the work performed under the shell improvement contract and the county's use of its lease space.

██ The department argues that the court's interpretation unduly emphasizes whether the construction contract was signed before or after the county's lease instead of focusing on the nature of the work performed. The date on which the construction contract was signed is important, however, because it affects whether the owner can recoup any increased construction costs through its lease with the public entity. As the trial court explained, if the contract is signed after the lease has been entered, the owner is on notice that the prevailing wage law may apply. In this case, Kramer's lease with the county was negotiated based on the understanding that $7,678.50 of its $45,815.05 monthly rent would be allocated to pay for compliance with the prevailing wage law.[2] The trial court thus properly rejected the suggestion that an unsuspecting property owner might be "trapped" into paying prevailing wages. Contrariwise, if the construction contract is entered before the property has been leased to a public agency, there is no basis for the contracting parties to take the prevailing wage law into account when negotiating the terms of the contract.[3]

---

[2] The lease expressly provides that 30 cents per square foot of the monthly rent is allocated to "compliance with the prevailing wage." At 25,595 square feet, the allocation for compliance with the prevailing wage equals $7,678.50 a month.

[3] The possibility that a property owner and a government agency might simply defer signing a lease until the construction contract has been entered, for the purpose of avoiding the impact of the prevailing wage law, is minimal since, among other reasons, the statute also applies if "[t]he construction work is performed according to plans, specifications, or criteria furnished by the state or political subdivision, and the lease agreement between the lessor and the state or political subdivision, as lessee, is entered into during, or upon completion of, the construction work." (§ 1720.2, subd. (c)(2).)

■ Finally, the court's construction of section 1720.2 does not produce any of the "absurd and unfair results" that the department hypothesizes. The department first suggests that under the court's interpretation Kramer would be required to pay prevailing wages for work performed in interior space leased by private tenants. As indicated above, however, that is not the situation presented in this case and may not be correct if the improvements performed for another tenant have no functional relationship to the space leased to the public agency. As the trial court explained, a court may reasonably resolve the department's concern in a subsequent case by "understanding the phrase 'any construction work,' as used in the statute, to refer to anything that has to do with the public entity occupancy or use of the building." The department also asserts that the court's interpretation would require application of the prevailing wage law to work performed in perpetuity after the county lease has expired and the public entity is no longer a tenant. "The expiration or termination of the lease," it asserts, "will not extinguish [Kramer's] liability for prevailing wages or the liability of any subsequent purchaser of the Building." We do not understand this contention. Section 1720.2 applies only if "upon completion of the construction work, more than 50 percent of the assignable square feet of the property is leased to the state or a political subdivision for its use." (*Id.*, subd. (b).) If the tenancy has expired, the prevailing wage law will not apply to construction work contracted for after the public agency no longer occupies the space.

The department also finds absurdity in the fact that prevailing wages are required "whenever the building's exterior, shell or common areas need construction work," in the potential market effects it suggests the court's interpretation may cause, and in the fact that this interpretation may "creat[e] a disincentive for private building owners to lease less than 100 percent of the assignable space to public entities." These concerns, however, are properly addressed to the Legislature. They reflect no absurdity and do not justify distorting the meaning of the statute as it now reads.

■ We therefore affirm the trial court's order compelling the department to vacate its June 8, 2005 decision determining that the shell improvement contract is not a public work within the meaning of section 1720.2.

## 2. *Attorney Fees*

The trial court awarded $55,010 in attorney fees to Local 290 pursuant to Code of Civil Procedure section 1021.5. The statute provides in pertinent part: "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on

the general public or a large class of persons, [and] (b) the necessity and financial burden of private enforcement . . . are such as to make the award appropriate . . . ." The attorney fees were imposed upon both the department and upon the real parties in interest.[4] The department contends the award against it must be reversed because it is not an opposing party for purposes of this section, but a neutral public agency required by law to issue and defend its public works coverage decision. The department also contends the trial court abused its discretion in concluding that the elements necessary for an award of attorney fees under section 1021.5 are present in this case.

The department argues that "the obligation of the director to perform ministerial acts, and thereafter defend them, while also remaining a neutral party in the administrative process, is inconsistent with the trial court's imposition of liability on the director for the payment of [Local 290's] attorney fees." It suggests that "it is [the] real parties who solely should bear the liability for payment of [Local 290's] attorney fees as they have the ultimate responsibility for compliance with the prevailing wage laws."

■ Whether the department is an opposing party within the meaning of Code of Civil Procedure section 1021.5 is a question of statutory construction subject to our de novo review. (*Connerly v. State Personnel Bd.* (2006) 37 Cal.4th 1169, 1176 [39 Cal.Rptr.3d 788, 129 P.3d 1] (*Connerly*).) An "opposing party" against whom attorney fees may be awarded pursuant to Code of Civil Procedure section 1021.5 is defined broadly as "a party whose position in the litigation was adverse to that of the prevailing party. Simply put, an 'opposing party' within the meaning of section 1021.5 is a losing party." (*Nestande v. Watson* (2003) 111 Cal.App.4th 232, 240–241 [4 Cal.Rptr.3d 18].) In *Connerly*, the court explained, "Because the term 'opposing parties' is not defined, it can be assumed that the Legislature was referring to the conventional definition of that term. As we have recognized, the edition of Black's Law Dictionary current at the time that section 1021.5 was drafted states that ' "[p]arty" is a technical term having a precise meaning in legal parlance; it refers to "those by or against whom a suit is brought . . . , the party plaintiff or defendant . . . ." ' [Citation.] [¶] Generally speaking, the opposing party liable for attorney fees under section 1021.5 has been the defendant person or agency sued, which is responsible for initiating and maintaining actions or policies that are deemed harmful to the public interest and that gave rise to the litigation." (*Connerly, supra,* at pp. 1176–1177.)

■ Here, the department was the agency responsible for initiating and maintaining the relevant policy decision that was the subject of this litigation. The department acknowledges that "[c]overage determinations are quasi-legislative administrative opinions that interpret statutes that the director is

---

[4] Real parties in interest have not appealed the attorney fee award.

responsible for enforcing." Indeed, as noted above, the department argues that "[i]n interpreting section 1720.2, this court should give deference to the director's interpretation as it involves an area of agency expertise and is performed by the director himself, the most senior agency official, after careful consideration of the facts, the relevant law and the parties' positions."[5] While the department emphasizes that coverage determinations are not regulations, it acknowledges that when designated as precedential they can be used as guidance in cases with similar facts. (*Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557, 571 [59 Cal.Rptr.2d 186, 927 P.2d 296] ["interpretations that arise in the course of case-specific adjudication are not regulations, though they may be persuasive as precedents in similar subsequent cases"].) Government Code section 11425.60, subdivision (b), authorizes an agency such as the department to designate a coverage determination as precedential if it "contains a significant legal or policy determination of general application that is likely to recur." Although "[d]esignation of a decision or part of a decision as a precedent decision is not rulemaking" (*ibid.*), the Law Revision Commission comments explain that "[t]he first sentence of subdivision (b) recognizes the need of agencies to be able to make law and policy through adjudication as well as through rulemaking." (Cal. Law Revision Com. com., Deering's Ann. Gov. Code (1997 ed.) foll. § 11425.60, p. 153.) The department designated the coverage determination decision in this case as precedential, thereby exercising its ability to make law and policy through adjudication.

Nothing in *Connerly, supra,* 37 Cal.4th 1169, suggests that a public agency cannot be deemed an opposing party liable for attorney fees when its policymaking decisions are challenged and set aside in litigation. In *Connerly,* the court held that the California Business Council for Equal Opportunity, which initially participated in that action as an amicus curiae, but was later named as a real party in interest and called upon to defend the state's affirmative action statutes, was not an opposing party under Code of Civil Procedure section 1021.5. (37 Cal.4th at pp. 1173, 1183.) The court noted that "the California Business Council clearly is not an 'opposing party' because it was responsible neither for enacting nor enforcing the statutes that were judged to be unconstitutional in the underlying litigation." (*Id.* at p. 1177.) The court concluded that although the California Business Council actively participated in the litigation as the real party in interest, it was not liable for

---

[5] The department's suggestion that its interpretation of section 1720.2 is entitled to deference is inconsistent with its subsequent characterization of the decision as the "performance of [the department's] ministerial duties." (See *Yamaha Corp. of America v. State Bd. of Equalization, supra,* 19 Cal.4th at p. 7, quoting *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 576 [38 Cal.Rptr.2d 139, 888 P.2d 1268] [" 'Quasi-legislative administrative decisions are properly placed at that point of the continuum at which judicial review is more deferential; ministerial and informal actions do not merit such deference, and therefore lie toward the opposite end of the continuum' "].)

attorney fees because it did not have "a direct interest in the litigation, the furtherance of which was generally at least partly responsible for the policy or practice that gave rise to the litigation, or were codefendants with a direct interest intertwined with that of the principal defendant." (*Id.* at p. 1181.) The court found that the council had "only an ideological or policy interest typical of an amicus curiae." (*Ibid.*) Unlike the California Business Council in *Connerly*, the department was the defendant in this litigation and directly responsible for issuing the policy decision that is the subject of the action.

■ *Citizens Against Rent Control v. City of Berkeley* (1986) 181 Cal.App.3d 213 [226 Cal.Rptr. 265] is instructive. The city argued that Code of Civil Procedure section 1021.5 fees should not be awarded against it because it was merely defending a local ballot measure passed by its voters. (*Citizens Against Rent Control*, at pp. 231–232.) The city argued that "in litigating over an initiative measure, a city does not have the 'luxury of choice' but must 'carry out the will of the People by defending initiative measures until the legal issues have been finally resolved by the courts.' " (*Id.* at p. 232.) The court rejected this argument, noting that "there is no 'good faith' exception to the private-attorney-general doctrine and that 'good faith' is . . . not a special circumstance that would make [a section 1021.5] award unjust." (*Id.* at p. 231.) Similarly, in *Schmid v. Lovette* (1984) 154 Cal.App.3d 466 [201 Cal.Rptr. 424], the court rejected a school district's contention that section 1021.5 fees should not be assessed against it because, under state law, it had no choice but to enforce a state statute requiring certain persons to take a loyalty oath. The court concluded that the district's good faith was not a defense because the purpose of section 1021.5 is not to punish defendants but to encourage suits effectuating strong public policies that benefit a broad class of persons. (*Schmid*, at pp. 474–476.) In the present action, the department issued a policy determination that has been set aside. The fact that the department was charged by law with settling the coverage dispute between Local 290 and the real parties in interest does not render section 1021.5 inapplicable. (See, e.g., *Kern River Public Access Com. v. City of Bakersfield* (1985) 170 Cal.App.3d 1205, 1226 [217 Cal.Rptr. 125] [attorney fees awarded against city based on plaintiff's successful petition for writ of mandate challenging subdivision approval].)

The trial court found that this action involved enforcement of an important right affecting the public interest and that it conferred a significant benefit upon a large class of persons or the general public. The department argues that the potential recovery of $18,000 by seven plumbers is not significant and that the precedential value of its determination is limited by "its unique

set of facts and a narrow legal issue."[6] We agree with the trial court, however, that while "[t]he fact that [the department] designated its decision as precedential is not dispositive, [it] is one of the factors tending to show an important right extending a significant benefit to a large class [of persons] . . . ." In addition, Local 290 submitted declarations from three people with experience in prevailing wage enforcement who agreed that the decision involved in this case "established an important precedent benefitting a large number of employers in the State . . . , dozens of local unions representing their workforce, and many thousands of workers in the construction industry." Roger Miller, a former regional manager of the department explained, "In my experience, many public agencies lease property from private owners on which construction takes place both within leased space and on common area. I have reviewed the precedential decision involved in this case [citation]. I believe that it would create a major loophole in prevailing wage coverage which would have adverse effects statewide on many trades whose primary work is done on common areas, not within leased space." Fred Steiner, the assistant executive director of Piping Industry Progress Education & Trust Fund, confirmed that he and his staff "regularly consult [the department's] precedential public works decisions and in my experience, so do many construction trades, unions and joint committees." Accordingly, substantial evidence supports the trial court's finding that the decision in this case "is likely to affect other projects and other trades in the future."

The trial court correctly found support for its conclusion in *Northern Cal. Carpenters Regional Council v. Warmington Hercules Associates* (2004) 124 Cal.App.4th 296, 300–301 [20 Cal.Rptr.3d 918] (*Warmington Hercules*). In *Warmington Hercules*, the court held that a union's action to enforce a city's prevailing wage policy enforced "an important right affecting the public interest" and conferred "a significant benefit . . . on the general public or a large class of persons."[7] (124 Cal.App.4th at p. 300.) The court explained, "[T]he City's Prevailing Wage Policy serves the same public interests as the

---

[6] Although no damages are recoverable in the writ proceedings, the department explains that it "is aware that seven workers may have claims for unpaid prevailing wages amounting to a total of approximately $18,000."

[7] The court in *Warmington Hercules* was applying Code of Civil Procedure section 425.17, subdivision (b), which excludes from the scope of the anti-SLAPP (strategic lawsuit against public participation) statute (Code Civ. Proc., § 425.16) actions that meet, among other requirements, the following conditions: "The action, if successful, would enforce an important right affecting the public interest, and would confer a significant benefit, whether pecuniary or nonpecuniary, on the general public or a large class of persons [and] [¶] Private enforcement is necessary and places a disproportionate financial burden on the plaintiff in relation to the plaintiff's stake in the matter." (Code Civ. Proc., § 425.17, subd. (b)(2), (3).) As the trial court noted, these conditions are the same as the standards found in Code of Civil Procedure section 1021.5. (*Blanchard v. DIRECTV, Inc.* (2004) 123 Cal.App.4th 903, 914 [20 Cal.Rptr.3d 385] ["The Legislature 'sharply defined' the public-interest exception of subdivision (b) of section 425.17 by reference to the three 'factors corresponding to the state's private attorney general

Labor Code provisions requiring payment of the prevailing wage on public works. First, the Prevailing Wage Policy permits 'union contractors to compete with nonunion contractors' [citations], and thereby serves the policy favoring collective bargaining in the private sector. [Citation.] Secondly, the Prevailing Wage Policy 'benefit[s] the public through the superior efficiency of well-paid employees.' [Citations.] As stated in the legislative findings for Labor Code section 1771.9 (Stats. 2003, ch. 851, § 1), '[p]ayment of the prevailing rate of per diem wages to workers employed on public works projects is necessary to attract the most skilled workers for those projects and to ensure that work of the highest quality is performed on those projects.' [¶] The Prevailing Wage Policy also serves the goal of protecting 'employees from substandard wages that might be paid if contractors could recruit labor from distant cheap-labor areas.' [Citations.] By assuring that public contracts will not 'undermine the wage base in [the] community' [citation], the policy serves to protect all 'private sector workers' in the community [citation]— clearly 'a large class of persons' within the meaning of Code of Civil Procedure section 425.17, subdivision (b)(2)." (*Warmington Hercules, supra,* at pp. 300–301.) The same public interests were at stake in the present action.

Likewise, the trial court did not abuse its discretion in concluding that "the necessity and financial burden of private enforcement" make the award appropriate. In *Warmington Hercules*, a private enforcement action was necessary because " 'the City of Hercules has failed to take any action to enforce the City's Wage Policy on the Project.' " (*Warmington Hercules, supra,* 124 Cal.App.4th at p. 301.) The financial burden on the union and individual plaintiff that brought the action was disproportionate to their stake in the matter because "[t]he Carpenters Regional Council and Drescher [brought] the action to vindicate a public interest relating to enforcement of the Prevailing Wage Policy but do not themselves belong to the under-compensated class of nonunion workers." (*Ibid.*) Likewise, in the present action, no other person or entity challenged the department's decision. The financial burden of the litigation was also disproportionate to Local 290's interests in the action. The record establishes that no Local 290 member performed work under the shell improvement contract and neither the union nor its members realized a "direct monetary gain by prevailing in this case." As the trial court explained, "The relatively small size of the Cruz Plumbing contract involved here . . . tends to confirm that the financial burden of this litigation on [Local 290] significantly exceeds any financial benefit to [Local 290] and its members in the future." Declarations submitted by Local 290 confirm that although this decision would significantly impact the membership and contractors affiliated with trade unions all over the State of California, its jurisdiction in Humboldt and Del Norte Counties is small and that "[o]ver 98

statute' so that subdivision (b) 'parallels the existing exception for actions by the attorney general and public prosecutors' "].)

percent of [Local 290's] membership lives and works outside of California and thus would not benefit in the least from [Local 290] having prevailed in this lawsuit." Any potential financial incentive for Local 290 and its members is indirect and largely speculative. (See *Galante Vineyards v. Monterey Peninsula Water Management Dist.* (1997) 60 Cal.App.4th 1109, 1127–1128 [71 Cal.Rptr.2d 1] [fact that "there is no direct pecuniary benefit to petitioners in the judgment" and that "any future money advantage for petitioners is speculative . . . tend to favor a grant of attorney's fees" under Code Civ. Proc., § 1021.5].)

The department argues that "[a]ny public benefit achieved here is coincidental to [Local 290's] objective of preventing non-union contractors from obtaining a competitive advantage over union contractors and obtaining prevailing wages for the workers involved in the shell plumbing work." The department relies on allegations in Local 290's petition that it "has a beneficial interest in this matter . . . . Plumbers and pipe fitters represented by [Local 290] who might have performed this work if it had been properly considered public work were deprived of the work in favor of workers who did not receive prevailing wages." That Local 290 has an interest in "maintaining a level playing field" for its members does not defeat its claim for attorney fees. (See *Press v. Lucky Stores, Inc.* (1983) 34 Cal.3d 311, 321, fn. 11 [193 Cal.Rptr. 900, 667 P.2d 704] ["That plaintiffs' personal interests in the outcome of the oil profits initiative were sufficient to induce them to bring this action is irrelevant. As the statute makes clear, subdivision (b) of section 1021.5 [of the Code of Civil Procedure] focuses not on plaintiffs' abstract personal stake, but on the financial incentives and burdens related to bringing suit. Indeed, in the absence of some concrete personal interest in the issue being litigated, the putative plaintiff would lack standing to bring an action"].)[8]

Finally, we reject the department's contention that charges incurred by Local 290 for computerized legal research are not recoverable as attorney fees under Code of Civil Procedure section 1021.5. (See *California Common Cause v. Duffy* (1987) 200 Cal.App.3d 730, 753–754 [246 Cal.Rptr. 285] [upholding attorney fee award under Code Civ. Proc., § 1021.5 that included compensation for "109 minutes of computer research and 309.7 hours of work by three attorneys"]; *Trustees of Const. v. Redland Ins. Co.* (9th Cir. 2006) 460 F.3d 1253, 1258–1259 ["growing circuit consensus" that "reasonable charges for computerized research may be recovered as 'attorney's fees' " under federal law].)

Accordingly, the trial court did not err in awarding Local 290 attorney fees against the department.

---

[8] Based on this same analysis, we reject the department's argument that the amount of the fee award should be reduced to reflect Local 290's "purely personal interest in the litigation."

## Disposition

The judgment is affirmed. Local 290 is to recover its costs on appeal.

McGuiness, P. J., and Siggins, J., concurred.