[No. H034143. Sixth Dist. Jan. 10, 2011.]

MONTEREY/SANTA CRUZ COUNTY BUILDING AND
CONSTRUCTION TRADES COUNCIL et al., Plaintiffs and Respondents,
v.
CYPRESS MARINA HEIGHTS LP, Defendant and Appellant.

COUNSEL

Allen Matkins Leck Gamble Mallory & Natsis, Patrick Edward Breen and Francis N. Scollan for Defendant and Appellant.

Davis Cowell & Bowe, John Jacobs Davis, Jr., Andrew J. Kahn and Paul L. More for Plaintiffs and Respondents.

OPINION

**MIHARA, J.**—Plaintiffs,[1] who are labor organizations, an association of contractors, and two City of Marina taxpayers, prevailed in their action for declaratory and injunctive relief against Cypress Marina Heights LP (CMH). CMH had acquired Fort Ord land from the City of Marina's redevelopment Agency (MRDA) for the development of CMH's Marina Heights project. MRDA had acquired that land from the Fort Ord Reuse Authority (FORA or Authority). Deed covenants in the FORA/MRDA deeds required payment of the prevailing wage to workers on all development of the land. CMH refused to commit to pay the prevailing wage to workers on the Marina Heights project. It claimed that its purchase agreement with MRDA did not require payment of the prevailing wage. The trial court granted plaintiffs' summary adjudication motion and found that it was undisputed that CMH was required to pay the prevailing wage on the Marina Heights project. The court thereafter entered judgment for plaintiffs and awarded plaintiffs their attorney's fees under Code of Civil Procedure section 1021.5.

CMH appeals. It claims that triable issues of fact precluded summary adjudication of the prevailing wage issue. CMH also contends that the trial court abused its discretion in awarding plaintiffs their attorney's fees and awarded plaintiffs an excessive amount of fees. We find no error or abuse of discretion in the trial court's rulings and affirm the judgment.

## I. Undisputed Facts

Fort Ord was a military base in Monterey County which closed in 1994. FORA was created by the Legislature to facilitate the transition of Fort Ord to civilian use. FORA's board is made up of representatives from each of its

---

[1] Plaintiff Monterey/Santa Cruz County Building and Construction Trades Council is an association of 22 local unions. Plaintiff International Brotherhood of Electrical Workers is a labor organization representing "construction and other workers." Plaintiff Mechanical Contractors Council of Central California is an association of local mechanical contractors. Plaintiffs Ranae and William Gary Martin are residents of, and taxpayers in, the City of Marina and the County of Monterey.

member jurisdictions, including the City of Marina. In 1997, the FORA board adopted a "Master Resolution."[2]

Chapter 3 of the Master Resolution was entitled "Procurement Code."[3] Article 3.03 of this chapter was entitled "Public Works Contracts." The first seven sections of this article dealt with the procedures for bids on public projects. The fourth section of this article, section 3.03.040, was entitled "Local Preference." The eighth and ninth sections of this article concerned prevailing wages.

Section 3.03.090, which was entitled "Prevailing Wages," provided: "Not less than the general prevailing rate of wages for work of a similar character in Monterey County as determined by the Director of the Department of Industrial Relations pursuant to the provisions of Division 2, Part 7, Chapter 1 of the California Labor Code shall be paid to all workers employed on construction.[4] This subsection is applicable only to work performed under contract and is not applicable to work carried out by the Authority with its own forces."

Section 3.03.100, which was entitled "Developers of Property Pursuant to Agreements with FORA," provided: "Any developer or owner of property, including any governmental entity, who enters into an Agreement with FORA for the acquisition, disposition, or development of property at Fort Ord shall pay or cause to be paid to all workers employed in connection with the development of such property an amount not less than the general prevailing rate of pay as established pursuant to Section 3.03.090 of this Master Resolution and shall employ local workers and grant local preferences pursuant to Section 3.03.040 of this Master Resolution. The provisions of this section relating to the payment of prevailing wages pursuant to Section 3.03.090 of this Master Resolution shall apply only to work performed under contract and are not applicable to work carried out by paid, full time employees of the developer or owner of property."[5]

In 1999, the City of Marina (the City) promulgated a "Request for Qualifications/Proposals for a Master Housing Developer" (RFQ) for a

---

[2] In 1995, the FORA board adopted "Ordinance No. 95-01." Ordinance No. 95-01 was the precursor to the Master Resolution.

[3] We omit much of the capitalization in the titles.

[4] Section 3.01.020 of the Master Resolution defined "construction" so as to limit it to work on property owned, leased, or maintained by FORA.

[5] Ordinance No. 95-01 contained the same prevailing wage language as the Master Resolution, but this language appeared in a section of the ordinance entitled "General Provisions" rather than, as in the Master Resolution, a section entitled "Procurement Code" or "Public Works Contracts."

housing development on Fort Ord land. The City's RFQ stated: *"FORA and the City shall require the Master Developer to pay prevailing wage rates, comply with FORA local preference policy and be consistent with the FORA procurement code."* When CMH submitted a bid in response to the RFQ, the City noted that CMH's bid had not "Specifically Addressed" the prevailing wage requirement.

In 2001, FORA entered into an "Implementation Agreement" with the City governing the transfer of Fort Ord property to the City. The Implementation Agreement, which was recorded, required the City to "use or transfer" any such property in compliance with the Master Resolution and the specific deed restrictions which were attached to the Implementation Agreement. These deed restrictions included: "The Owner, for itself and for its heirs, assigns, and successors in interest, covenants and agrees that: [¶] . . . Any development of the property will be and is subject to the provisions of the Reuse Plan, the policies and programs of the Fort Ord Reuse Authority, including the Authority's Master Resolution . . . ." "This Deed Restriction and Covenants . . . is hereby deemed and agreed to be a covenant running with the land binding all of the Owner's assigns or successors in interest." The Implementation Agreement was an integrated agreement, and it provided: "No waiver of any right or obligation of either Party hereto shall be effective unless in writing, specifying such waiver, executed by the Party against whom such waiver is sought to be enforced." The Implementation Agreement permitted the City to assign its rights under the agreement to its redevelopment agency.

In 2002, the City and its redevelopment agency (MRDA) entered into an "Option Agreement" with CMH under which CMH obtained the option to purchase a 248-acre site within Fort Ord and develop 1,050 residential units on this site. This proposed residential development was referred to as the Marina Heights project. Almost all of the proposed residential units were intended to be sold to the general public at market rates.

In 2005 and March 2006, FORA conveyed the property upon which the Marina Heights project was to be sited to MRDA by means of a series of quitclaim deeds, which were recorded. MRDA paid $1 for each deed. The deeds stated that the Implementation Agreement set forth the terms and conditions upon which the deeds were conveyed and accepted: "[The Implementation Agreement] sets forth the specific terms and conditions upon which the Grantor agrees to convey and the Grantee agrees to accept title" to this property. (Boldface omitted.) The deeds also stated: "Grantee covenants for itself, its successors, and assigns and every successor in interest to the Property, or any part thereof, that Grantee and such successors and assigns shall comply with all provisions of the Implementation Agreement as if the

Grantee were the referenced Jurisdiction under the Implementation Agreement and specifically agrees to comply with the Deed Restrictions and Covenants set forth in Exhibit F of the Implementation Agreement as if such Deed Restrictions and Covenants were separately recorded prior to the recordation of this Deed." (Boldface omitted.) Finally, the deeds stated: "The conditions, restrictions, and covenants set forth in this Deed are a binding servitude on the herein conveyed Property and will be deemed to run with the land in perpetuity. Restrictions, stipulations and covenants contained herein will be inserted by the Grantee verbatim or by express reference in any deed or other legal instrument by which it divests itself of either the fee simple title or any other lesser estate in the Property or any portion thereof." (Boldface omitted.)

In April 2006, MRDA conveyed the Marina Heights property to CMH by quitclaim deeds pursuant to the Option Agreement in exchange for more than $10 million. CMH paid fair market value for the property, and it received no public subsidies. MRDA's deeds to CMH stated that "[t]he Property is conveyed subject to the Option Agreement," and they required CMH to "comply with all of the terms and conditions of the Option Agreement with respect to the construction of Improvements . . . ." The deeds also provided: "The conditions, restrictions, and covenants set forth in this deed are a binding servitude on the herein conveyed Property and will be deemed to run with the land in perpetuity."

In March 2007, the FORA board amended its prevailing wage policy to clarify that the prevailing wage " 'shall be paid to all workers employed on the first generation construction performed on parcels subject to the Fort Ord Base Reuse Plan' " including " 'work performed . . . by contract with a FORA member or a FORA member agency including their transferees, agents, successors-in-interest, developers or building contractors.' "

## II. Procedural Background

In October 2006, plaintiffs filed an action against Marina Community Partners, LLC (MCP), Shea Properties LLC (Shea), W. L. Butler Construction, Inc., Target Corporation, MRDA, and various individuals. In July 2007, plaintiffs filed a second[6] amended complaint which added as defendants CMH, East Garrison Partners I LLC (Garrison), and the Monterey County Redevelopment Agency.[7] Plaintiffs alleged that CMH had violated the deed covenants, the Labor Code, and the unfair competition law (UCL) by refusing

---

[6] The record does not contain a first amended complaint.

[7] Target Corporation was not named in the second amended complaint.

to honor its obligation to pay the prevailing wage.[8] Plaintiffs sought an injunction mandating that CMH pay the prevailing wage, and a declaration that CMH was required to pay the prevailing wage. They also sought attorney's fees under Code of Civil Procedure section 1021.5.

In February 2008, the trial court issued a preliminary injunction against some of the defendants named in the original complaint, but not CMH or Garrison.[9]

In July 2008, plaintiffs filed a motion for summary judgment or summary adjudication of their causes of action against CMH.[10] Plaintiffs asserted that the Master Resolution, the Implementation Agreement, the deed covenants, and the extrinsic evidence all unambiguously required CMH to pay and cause to be paid the prevailing wage. Plaintiffs argued that "the Master Resolution is made applicable to downstream government entities and developers through the implementation agreement," which binds the downstream developers through the deed covenants In support of their motion, plaintiffs submitted the declaration of Ron Chesshire, who had been the president of plaintiff Monterey/Santa Cruz County Building and Construction Trades Council until 2008. Chesshire asserted that, if the Marina Heights project "is bid on a non-prevailing wage basis, many union-signatory contractors will either not bid on the work (because they correctly believe such bids would likely be futile), or if they bid will be less likely awarded the work."

CMH opposed the motion on multiple grounds. It argued (1) the Master Resolution's prevailing wage provisions apply to only public works; (2) CMH was not bound by the Master Resolution because its contract was with MRDA, not FORA, and the Option Agreement did not require CMH to pay the prevailing wage; (3) the prevailing wage requirement was not a covenant that runs with the land; (4) FORA and MRDA waived the prevailing wage requirement; and (5) plaintiffs lack standing to assert these claims against CMH.

---

[8] Plaintiffs alleged these same causes of action against Garrison. Garrison was a developer that had purchased Fort Ord land from another FORA member jurisdiction, the County of Monterey. Garrison, like CMH, insisted that the prevailing wage requirement in the Master Resolution did not apply to its project.

[9] In October 2008, while the summary judgment/summary adjudication motion was pending, the trial court approved a stipulation that settled plaintiffs' action against MCP, Shea, and MRDA. MCP and Shea agreed to pay the prevailing wage and to require any successors in interest to pay the prevailing wage. MRDA agreed to "require compliance with the prevailing wage requirements of the FORA Master Resolution . . . by all entities to which they [subsequently] transfer FORA property . . . ."

[10] Plaintiffs' motion also named MRDA, but MRDA settled with plaintiffs in October 2008. Plaintiffs filed a separate summary judgment/summary adjudication motion as to Garrison.

CMH submitted evidence that the Marina Heights project was not a "public works" project because it had paid "fair market value" for the land and was receiving no public subsidies. CMH also submitted extrinsic evidence which it claimed established that FORA, the City, and MRDA had not intended for the prevailing wage requirement in the Master Resolution to apply to successors in interest.[11] MRDA's attorney declared that it was "my understanding" that the Master Resolution and the Implementation Agreement did not "require prevailing wages," but "instead" left it to MRDA to decide whether to require that the prevailing wage be paid. In a March 2006 memo written by FORA's attorney to FORA's executive officer, FORA's attorney asserted that FORA "may not . . . require each entity taking title from FORA to pass this obligation along to its successors in title until the ice caps thaw or the sun fizzles out[.] The law disfavors such 'dead hand' deed restrictions. Landowners can not tie up its use with such minute restrictions." In an October 2006 memo from FORA's attorney to FORA's executive committee, the attorney reached a similar conclusion. "These provisions [sections 3.03.090 and 3.03.100 of the Master Resolution] do not require third parties to pay prevailing wages on Fort Ord. They limit that requirement to FORA and its contractors." CMH also asserted that, because construction had not yet begun, "no workers have actually been damaged (underpaid) because there has been no work on the project for which prevailing wages were owed but not paid." However, CMH made no secret of the fact that it did not intend to honor a prevailing wage requirement.

The superior court granted summary adjudication of two of plaintiffs' causes of action against CMH: the cause of action for violation of the deed covenants and the associated cause of action for declaratory relief. The court found that there were no triable issues regarding the requirement of "payment of prevailing wages on this project."[12] The court reasoned: "The plain meaning of Section 3.03.100, in context, supports Plaintiffs' arguments that the prevailing wage requirement was not restricted to public works contracts." Under the Master Resolution, "as enforced through the Implementation Agreement and deed covenants[,] . . . prevailing wages are required to be paid on the project." The court discounted CMH's reliance on the Option

---

[11] Plaintiffs, on the other hand, submitted extrinsic evidence consistent with the plain language of these documents. FORA's executive officer, Michael A. Houlemard, Jr., wrote a May 2003 memo regarding the application of the Master Resolution's prevailing wage provisions. The memo, which referenced sections 3.03.090 and 3.03.100 of the Master Resolution, stated: "[W]e interpret the Master Resolution to require developers to pay prevailing wage when performing work on the former Fort Ord regardless of the contracting agency for whom the work is performed." "We read the prevailing wage section quoted above to apply to work performed under contract to the jurisdiction . . . . The same is true of subsequent future purchasers of the property."

[12] The court denied summary adjudication of plaintiffs' causes of action for violations of the Labor Code and the unfair competition law.

Agreement and on the intent of the parties to the Option Agreement because "any downstream agreement . . . cannot circumvent the Master Resolution's prevailing wage requirement. . . . [MRDA] could not simply bargain away the prevailing wage requirements."

Plaintiffs abandoned their remaining causes of action against CMH and sought entry of judgment requiring CMH to pay the prevailing wage. The court entered a judgment awarding plaintiffs declaratory and injunctive relief. The court declared that CMH's Marina Heights project is "covered by prevailing wage requirements in the Ford Ord Reuse Authority Master Resolution and implementing documents," and ordered CMH to "pay prevailing wages" on "all 'First Generation Construction' work" on the Marina Heights project. The court defined "First Generation Construction" to mean "construction performed during the development of each parcel of real property at the time of transfer from the public agency" to CMH "until issuance of a certificate of occupancy by the initial owners or tenants of each parcel." The judgment also required CMH to "include in all calls for bids, bid specifications and contracts . . . an express requirement that such work be performed at the prevailing wage . . . ."

Plaintiffs filed a motion seeking $212,550 in attorney's fees under Code of Civil Procedure section 1021.5 from CMH and Garrison, as to whom plaintiffs had also obtained summary adjudication on a separate motion.[13] In support of their motion, they submitted their billing records and an expert's declaration that the hourly rates sought were reasonable. Chesshire submitted a declaration in which he stated that the case had "benefitted a large class of persons" because the Marina Heights project and the Garrison project were expected to "provide work to over 900 construction workers." Because "we do not expect unionized contractors will get all the work on these projects," the judgment would benefit many contractors who were not members of the unions represented by plaintiffs. Plaintiffs argued that fees for work done "analyzing the Master Resolution and implementation agreements and the issues of standing" in connection with plaintiffs' action against other defendants were properly chargeable to CMH and Garrison because this work was "common work . . . done on common issues . . . ."

CMH opposed plaintiffs' attorney's fees motion. It asserted that plaintiffs had failed to demonstrate that their action had "benefitted the general public or a large class beyond Plaintiffs' own members and the unions themselves." CMH also argued that liability for attorney's fees should not be joint and

---

[13] In the same order in which the court granted summary adjudication of two of plaintiffs' causes of action against CMH, the trial court granted plaintiffs' motion for summary adjudication of four of their causes of action against Garrison. Two of the causes of action were the same ones that the court summarily adjudicated against CMH.

several between CMH and Garrison because different projects were involved. Finally, CMH urged that the amount of fees sought was unreasonable, and it maintained that $25,000 was the amount of fees attributable solely to plaintiffs' action against CMH. CMH argued that the only attorney's fees attributable to CMH were the fees associated with the filing of the second amended complaint and the summary judgment/summary adjudication motion against CMH.

The court found that the litigation "resulted in the enforcement of an important right affecting the public interest." "[I]t has ramifications that's [*sic*] beyond the interests of the parties directly before the court." Public agencies had refused to pursue this litigation, and the financial burden of the fees far exceeded the financial value of the litigation to plaintiffs. "Plaintiffs' pecuniary benefit will be indirect and uncertain." Thus, plaintiffs were entitled to fees. The court also found that the hourly rate sought was reasonable. In terms of whether time spent on other parts of the litigation was properly chargeable to CMH, the court found that "Plaintiffs' time spent on this entire action was useful and necessary to its ultimate resolution." The court decided not to make the award joint and several but to allocate only 35 percent of the fees to CMH and the other 65 percent of the fees to Garrison. This was based on the court's finding that CMH was "less culpable" than Garrison.[14] The court ordered CMH to pay $73,167.50 in attorney's fees. The court entered an amended final judgment which incorporated the attorney's fees award. CMH timely filed a notice of appeal.

## III. Discussion

CMH contends that the Master Resolution's provisions did not apply to its project because those provisions were limited to public works and to those in privity with FORA. CMH also contends that the deed covenants did not contain a prevailing wage requirement, or at least there were triable issues of fact as to whether they did, and, in any case, those covenants did not run with the land. Finally, CMH contends that any prevailing wage requirement could not be enforced against it because FORA waived the requirement and plaintiffs lacked standing to enforce such a requirement. CMH also challenges the attorney's fees award.

### A. Summary Adjudication Standard of Review

"Appellate review of a ruling on a summary judgment or summary adjudication motion is de novo." (*Brassinga v. City of Mountain View* (1998)

---

[14] Garrison had not purchased the land for its project at fair market value, so its project was a public works project covered by the Labor Code's prevailing wage requirement.

66 Cal.App.4th 195, 210 [77 Cal.Rptr.2d 660].) "The purpose of the law of summary judgment [and summary adjudication] is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 [107 Cal.Rptr.2d 841, 24 P.3d 493] (*Aguilar*).) "[S]ummary judgment law in this state no longer requires a plaintiff moving for summary judgment to disprove any defense asserted by the defendant as well as prove each element of his own cause of action." (*Aguilar*, at p. 853.) "All that the plaintiff need do is to 'prove[] each element of the cause of action.' " (*Ibid.*) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar*, at p. 850.) "Thus, if a plaintiff who would bear the burden of proof by a preponderance of evidence at trial moves for summary judgment, he must present evidence that would *require* a reasonable trier of fact to find any underlying material fact more likely than not—otherwise, he would not be entitled to judgment *as a matter of law*, but would have to present his evidence to a trier of fact." (*Aguilar*, at p. 851.)

### B. The Master Resolution

The Master Resolution is the originating source of any prevailing wage requirement that applies to CMH's project. CMH contends that the Master Resolution's prevailing wage requirements could not apply to CMH's project because those requirements are contained in the "Procurement Code" chapter and the "Public Works" article of the Master Resolution and are limited to those developers who contract directly with FORA.

The two sections of the Master Resolution which set forth a prevailing wage requirement appear in a chapter entitled "Procurement Code" and, within that chapter, in an article entitled "Public Works Contracts." The first seven sections in this article concern procedures for bids on public projects. The eighth and ninth sections of this article are the ones concerning prevailing wages.

Section 3.03.090, the eighth section, entitled "Prevailing Wages," provides: "Not less than the general prevailing rate of wages for work of a similar character in Monterey County as determined by the Director of the Department of Industrial Relations pursuant to the provisions of Division 2, Part 7, Chapter 1 of the California Labor Code shall be paid to all workers employed on construction. This subsection is applicable only to work performed under contract and is not applicable to work carried out by the Authority with its own forces." It is undisputed that section 3.03.090 does not itself apply to CMH's project.

The critical section is section 3.03.100, entitled "Developers of Property Pursuant to Agreements with FORA." It provides: "Any developer or owner of property, including any governmental entity, who enters into an Agreement with FORA for the acquisition, disposition, or development of property at Fort Ord shall pay or cause to be paid to all workers employed in connection with the development of such property an amount not less than the general prevailing rate of pay as established pursuant to Section 3.03.090 of this Master Resolution and shall employ local workers and grant local preferences pursuant to Section 3.03.040 of this Master Resolution. The provisions of this section relating to the payment of prevailing wages pursuant to Section 3.03.090 of this Master Resolution shall apply only to work performed under contract and are not applicable to work carried out by paid, full time employees of the developer or owner of property."

CMH omits from its opening brief any mention of the rules which govern interpretation of the Master Resolution. In its reply brief, it concedes that the Master Resolution should be interpreted under the rules applicable to statutory construction, and it asserts that its interpretation must prevail because it is "logical" and the Master Resolution is "reasonably susceptible" of such an interpretation.

"We apply well-settled principles of statutory construction. Our task is to discern the Legislature's intent. The statutory language itself is the most reliable indicator, so we start with the statute's words, assigning them their usual and ordinary meanings, and construing them in context. If the words themselves are not ambiguous, we presume the Legislature meant what it said, and the statute's plain meaning governs. On the other hand, if the language allows more than one reasonable construction, we may look to such aids as the legislative history of the measure and maxims of statutory construction. In cases of uncertain meaning, we may also consider the consequences of a particular interpretation, including its impact on public policy." (*Wells v. One2One Learning Foundation* (2006) 39 Cal.4th 1164, 1190 [48 Cal.Rptr.3d 108, 141 P.3d 225].)

" 'If possible, significance should be given to every word, phrase, sentence and part of an act in pursuance of the legislative purpose.' [Citation.] . . . 'a construction making some words surplusage is to be avoided.' [Citation.] 'When used in a statute [words] must be construed in context, keeping in mind the nature and obvious purpose of the statute where they appear.' [Citations.] Moreover, the various parts of a statutory enactment must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole." (*Moyer v. Workmen's Comp. Appeals· Bd.* (1973) 10 Cal.3d 222, 230 [110 Cal.Rptr. 144, 514 P.2d 1224].)

██ CMH's primary contention is that section 3.03.090 applies only to public works projects because it appears in a chapter entitled "Procurement Code" and within that chapter in an article entitled "Public Works Contracts." "Title or chapter headings are unofficial and do not alter the explicit scope, meaning, or intent of a statute." (*DaFonte v. Up-Right, Inc.* (1992) 2 Cal.4th 593, 602 [7 Cal.Rptr.2d 238, 828 P.2d 140].) " '[T]he title of an act may be relied on in ascertaining the intention of the legislature, *where the act itself is ambiguous*; but the title "cannot be used for the purpose of restraining or controlling any positive provision of the act." ' " (*In re Bandmann* (1958) 51 Cal.2d 388, 392 [333 P.2d 339], italics added.) We may look at the chapter and article headings only if we first conclude that section 3.03.100 is *ambiguous*.[15] CMH's argument presupposes, rather than establishes, that section 3.03.100 is ambiguous. We conclude, as the superior court did, that section 3.03.100 is not ambiguous.

Section 3.03.100 plainly states: "Any developer or owner of property, including any governmental entity, who enters into an Agreement with FORA for the acquisition, disposition, or development of property at Fort Ord *shall pay or cause to be paid* to all workers employed in connection with the development of such property an amount not less than the general prevailing rate of pay . . . ." (Italics added.) The trial court found that section 3.03.100 requires any entity, such as MRDA, which acquires land from FORA not only to "pay" the prevailing wage itself but also to "cause to be paid" the prevailing wage "to all workers employed in connection with the development of such property . . . ."

CMH argues that section 3.03.100 applies only to public works contracts. This argument is not based on the text of section 3.03.100, which says nothing about public works contracts, but is based on CMH's reliance on the chapter and article headings. Since those headings are relevant only if section 3.03.100's text is ambiguous, this contention does not support CMH's implicit claim that section 3.03.100 is ambiguous. CMH's only other claim regarding the text of section 3.03.100 is that it does not apply to an entity such as CMH because CMH has no contract with FORA. However, no one claims that section 3.03.100 itself directly applies to CMH. The plain language of section 3.03.100 required *MRDA* to "cause to be paid" the prevailing wage. The only possible meaning of the requirement that MRDA must "cause to be paid" the prevailing wage was that MRDA was obligated

---

[15] We take note of the fact that Ordinance No. 95-01, the Master Resolution's predecessor statute, contained precisely the same prevailing wage language as the Master Resolution, but this language appeared in a part of the ordinance entitled "General Provisions." There is no evidence that FORA intended to change the meaning of the prevailing wage language when it placed this language in a particular chapter and article of the Master Resolution.

to ensure that any other entity employing workers in connection with the development of the property acquired by MRDA from FORA must pay the prevailing wage.

CMH offers no alternative construction of the "cause to be paid" language in section 3.03.100 in its opening brief. In its reply brief, the "cause to be paid" language is mentioned only in a footnote. CMH asserts, in its footnote, that this language obligated MRDA, not CMH, and could be enforced only by an action against MRDA. Of course, the question here is whether the Master Resolution required MRDA to require CMH to pay the prevailing wage. The question of whether this obligation was in fact passed on to CMH depends on whether the Implementation Agreement and the deed covenants did so. Our interpretation of the Master Resolution ends with a determination that the Master Resolution obligated MRDA to require CMH to pay the prevailing wage.

### C. The Implementation Agreement

The next question is whether the Implementation Agreement contained provisions which enforced MRDA's obligation to require CMH to pay the prevailing wage.

The Implementation Agreement mandated that any transfer of property acquired from FORA by MRDA[16] must be done in compliance with the Master Resolution and must incorporate specific deed covenants. The required deed covenants included: "The Owner, for itself and for its heirs, assigns, and successors in interest, covenants and agrees that: [¶] . . . Any development of the property will be and is subject to the provisions of the Reuse Plan, the policies and programs of the Fort Ord Reuse Authority, including the Authority's Master Resolution . . . ." "This Deed Restriction and Covenants . . . is hereby deemed and agreed to be a covenant running with the land binding all of the Owner's assigns or successors in interest."

■ "Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. (Civ. Code, § 1636.) Such intent is to be inferred, if possible, solely from the written provisions of the contract. (*Id.*, § 1639.) The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage' (*id.*, § 1644), controls judicial interpretation. (*Id.*, § 1638.)

---

[16] Although the Implementation Agreement was entered into by the City, it permitted the City to assign its rights and obligations under the Implementation Agreement to MRDA. Since it was MRDA which acquired the property from FORA, the City necessarily assigned its rights and obligations under the Implementation Agreement to MRDA.

Thus, if the meaning a layperson would ascribe to contract language is not ambiguous, we apply that meaning." (*AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 821–822 [274 Cal.Rptr. 820, 799 P.2d 1253].)

CMH contends that there are disputed factual issues about whether the deed covenants required by the Implementation Agreement were intended to make the Master Resolution's prevailing wage requirement a covenant running with the land. CMH relies on extrinsic evidence that it proffered. CMH produced a declaration from the attorney for the City and MRDA who recounted his understanding during the negotiation of the Implementation Agreement that the City and MRDA were not obligated to require CMH to pay the prevailing wage. CMH also produced various 2006 documents written by FORA's attorney and its executive officer and excerpts from 2006 FORA "minutes" and "Board Reports" in which there were statements that FORA lacked the power to itself require that downstream developers pay the prevailing wage and instead had to rely on the local jurisdictions to do so.

"The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." (*Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37 [69 Cal.Rptr. 561, 442 P.2d 641].) Thus, the question is whether the language of the Implementation Agreement is reasonably susceptible to the meaning that CMH's extrinsic evidence was offered to prove.

CMH offered this extrinsic evidence to prove that the deed covenants that the Implementation Agreement required MRDA to include in its deeds to CMH were *not* intended to obligate CMH to pay the prevailing wage. The language of the deed covenants stated that MRDA, for itself and its successors in interest, "covenants and agrees that: [¶] . . . Any development of the property will be and is subject to the provisions of the . . . Master Resolution . . . ." Rather than supporting an alternative meaning of which this language is reasonably susceptible, CMH's extrinsic. evidence would instead negate this provision of the Implementation Agreement. Although CMH claims that this provision of the Implementation Agreement was concerned with "land use restrictions, not labor policies," CMH identifies no "land use restrictions" of any kind in the Master Resolution to which this provision might be referring other than the prevailing wage and local preference requirements in the Master Resolution. Since this provision is not reasonably susceptible of an interpretation that attributes *no meaning* to its reference to the Master Resolution, CMH's extrinsic evidence was irrelevant and inadmissible.

The Implementation Agreement required MRDA to include in its deeds to CMH covenants requiring CMH to pay the prevailing wage.

## D. The Deed Covenants

The FORA/MRDA deeds expressly stated: (1) the Implementation Agreement contains the covenants; (2) these covenants "run with the land in perpetuity"; and (3) MRDA "covenants for itself, its successors, and assigns and every successor . . . to the Property." Nevertheless, CMH maintains that the deed covenants in the FORA/MRDA deeds do not meet the statutory requirements necessary to create prevailing wage covenants that run with the land.

■ "Certain covenants, contained in grants of estates in real property, are appurtenant to such estates, and pass with them, so as to bind the assigns of the covenantor and to vest in the assigns of the covenantee, in the same manner as if they had personally entered into them. Such covenants are said to run with the land." (Civ. Code, § 1460.) "The only covenants which run with the land are those specified in this Title, and those which are incidental thereto." (Civ. Code, § 1461.) "A covenant can run with the land under either section 1462 or section 1468 of the Civil Code." (*Scaringe v. J. C. C. Enterprises, Inc.* (1988) 205 Cal.App.3d 1536, 1543 [253 Cal.Rptr. 344] (*Scaringe*), disapproved on another ground in *Citizens for Convenant Compliance v. Anderson* (1995) 12 Cal.4th 345, 366 [47 Cal.Rptr.2d 898, 906 P.2d 1314] (*Citizens*).)

■ Civil Code section 1462 provides: "Every covenant contained in a grant of an estate in real property, which is made for the direct benefit of the property, or some part of it then in existence, runs with the land." (Civ. Code, § 1462.) "A covenant will run under Civil Code section 1462 if it is 'contained in a grant' conveying property and is made 'for the direct benefit of the property.' The California Supreme Court has narrowly applied section 1462, however, by holding that a covenant which burdens property does not run with the land [under section 1462]." (*Scaringe, supra*, 205 Cal.App.3d at p. 1543.)

"In contrast, Civil Code section 1468 permits enforcement of the burden as well as the benefit." (*Scaringe, supra*, 205 Cal.App.3d at p. 1543.) "Each covenant, made by an owner of land with the owner of other land or made by a grantor of land with the grantee of land conveyed, or made by the grantee of land conveyed with the grantor thereof, to do or refrain from doing some act on his own land, which doing or refraining is expressed to be for the benefit of the land of the covenantee, runs with both the land owned by or granted to the covenantor and the land owned by or granted to the covenantee

and shall . . . benefit or be binding upon each successive owner, during his ownership, of any portion of such land affected thereby . . . where all of the following requirements are met: [¶] (a) The land of the covenantor which is to be affected by such covenants, and the land of covenantee to be benefited, are particularly described in the instrument containing such covenants; [¶] (b) Such successive owners of the land are in such instrument expressed to be bound thereby for the benefit of the land owned by, granted by, or granted to the covenantee; [¶] (c) Each such act relates to the use, repair, maintenance or improvement of, or payment of taxes and assessments on, such land or some part thereof . . . ; [¶] (d) The instrument containing such covenants is recorded in the office of the recorder of each county in which such land or some part thereof is situated." (Civ. Code, § 1468.)

 The prevailing wage covenants facially complied with the requirements of Civil Code section 1468. The deed covenants were made by MRDA, the grantee of the land conveyed, with FORA, the grantor of the land. The deed covenants required MRDA to do an act (pay the prevailing wage) which would benefit all of the FORA land owned by FORA by ensuring that no parcel would be exempt from the prevailing wage requirement. Both the Marina Heights parcel burdened by the covenant and the FORA land benefitted by the covenant were "particularly described" in the deeds and in the Implementation Agreement, which were the instruments containing the covenants. (See *Alfaro v. Community Housing Improvement System & Planning Assn., Inc.* (2009) 171 Cal.App.4th 1356, 1375–1376 [89 Cal.Rptr.3d 659].) The Implementation Agreement and the deeds expressly stated that successive owners would be bound by the covenants. The "act" (the requirement that the prevailing wage be paid) "relates to the . . . improvement of" both the FORA land and the Marina Heights parcel. The deed covenants and the Implementation Agreement were all recorded.

 CMH argues that the prevailing wage covenant failed to satisfy Civil Code section 1468 because the Implementation Agreement was entered into before FORA acquired the property. As support for this proposition, CMH relies solely on *McCaffrey v. Preston* (1984) 154 Cal.App.3d 422 [201 Cal.Rptr. 252] (*McCaffrey*). In *McCaffrey*, the issue was whether the grantor had intended for a deed covenant to run with the land or, instead, for it to be personal. (*McCaffrey*, at pp. 435–436.) The deed covenants in question had been included in deeds executed in 1960 and 1961. Until the late 1960's, a prior version of Civil Code former section 1468 did not permit covenants running with the land to be entered into by the grantor and grantee of land, as the current version of Civil Code section 1468 does, but limited such covenants to only those made between two landowners. (*Taormina Theosophical Community, Inc. v. Silver* (1983) 140 Cal.App.3d 964, 972, fn. 3 [190 Cal.Rptr. 38]; *Citizens, supra*, 12 Cal.4th at p. 354.) It was in this context that the court in *McCaffrey* stated, "the covenantor and covenantee

must be owners of land at the time the covenant is made . . . ." (*McCaffrey*, at p. 436.) Since Civil Code section 1468 no longer requires that the covenant be entered into between two landowners, *McCaffrey* provides no support for CMH's contention. In any case, it is undisputed that FORA owned the FORA property at the time it entered into the covenants with MRDA, which occurred when the FORA/MRDA deeds were executed, not when the Implementation Agreement was executed. "Merely recording the restrictions does not create mutual servitudes. Rather, they 'spring into existence' only upon an actual conveyance." (*Citizens*, at p. 365.) Here, the covenants came into existence only upon the execution of the deeds, at which point FORA owned the property.

CMH also complains that "the Implementation Agreement does not state that successive owners are bound by its terms for the benefit of the land." Since CMH provides no support or explanation for this contention, it is unclear whether CMH is claiming that the covenants were invalid because they failed to state that they bound successive owners or because they failed to state that their terms were for the benefit of the land. In either case, CMH is incorrect. The deed covenants explicitly stated that they "will be deemed to run with the land in perpetuity," which necessarily expresses an intent to bind successive owners. Exhibit F to the Implementation Agreement, which was incorporated into the deed covenants, sufficiently expressed that the covenants were intended to benefit all of the FORA land by applying a uniform set of rules to the development of each parcel.

CMH contends that the deed covenants did not create a valid prevailing wage covenant because the deeds themselves "make no reference to prevailing wages." CMH cites no statutory or case authority to support its implied claim that a deed covenant may not validly incorporate restrictions described in another instrument. "[I]f the restrictions are recorded before the sale, the later purchaser is deemed to agree to them. The purchase of property knowing of the restrictions evinces the buyer's intent to accept their burdens and benefits. Thus, the mutual servitudes are created at the time of the conveyance even if there is no additional reference to them in the deed." (*Citizens, supra*, 12 Cal.4th at p. 363.) A written instrument, such as the Implementation Agreement, is sufficient to set forth the nature of the deed covenants so long as those to be bound have notice of those covenants. (*Hudson Oil Co. v. Shortstop* (1980) 111 Cal.App.3d 488, 495 [168 Cal.Rptr. 801].) Since the Implementation Agreement was recorded, CMH could not, and does not, claim that it lacked notice of its contents. Similarly, while the Implementation Agreement incorporated by reference the requirements in the

Master Resolution, which contained the prevailing wage requirement, CMH does not claim that it lacked notice of the contents of the Master Resolution.[17]

Finally, CMH contends that the language in the FORA/MRDA deeds did not actually bind successors in interest but instead bound only MRDA to the obligations that the City had originally assumed in the Implementation Agreement. The language in the deeds is not susceptible of such an interpretation. Besides explicitly stating that the covenants "will be deemed to run with the land in perpetuity," the deeds also state that the grantee (MRDA) "covenants for itself, *its successors, and assigns and every successor in interest to the Property, or any part thereof,* that Grantee *and such successors and assigns* shall comply with all provisions of the Implementation Agreement as if the Grantee were the referenced Jurisdiction under the Implementation Agreement and specifically agrees to comply with the Deed Restrictions and Covenants set forth in Exhibit F of the Implementation Agreement . . . ." (Boldface omitted & italics added.) This language indisputably binds MRDA's successors in interest.[18]

### E. Waiver

CMH argues that summary adjudication was prohibited because there was a material factual dispute about whether FORA "waived" the prevailing wage requirement. The Implementation Agreement, which contained the covenant requiring CMH to pay the prevailing wage, provided: "No waiver of any right or obligation of either Party hereto shall be effective unless in writing, specifying such waiver, executed by the Party against whom such waiver is sought to be enforced." CMH's opposition to plaintiffs' motion did not include any evidence that FORA had executed a writing "specifying" that FORA was waiving the prevailing wage requirement. CMH does not claim that any such writing exists. Instead, CMH relies on the Option Agreement, FORA's failure to respond to an e-mail from MRDA's attorney, and an excerpt from a FORA "Board Report." The Option Agreement was not executed by FORA; it was an agreement between MRDA and CMH. FORA's failure to respond to an e-mail from MRDA's attorney was not a writing executed by FORA. It is questionable whether an excerpt from a FORA Board Report qualifies as a writing executed by FORA, but, in any event, the excerpt did not "specify[]" that FORA was waiving the prevailing wage

---

[17] It is true that the Master Resolution was not recorded, but CMH has never contended that it lacked notice of the Master Resolution's prevailing wage requirement, which was expressly included in the RFQ.

[18] Because we reject CMH's claim that the prevailing wage covenants could not validly run with the land, we need not consider its contention that these covenants could not be enforced alternatively as equitable servitudes.

requirement. Since there was no evidence to support CMH's "waiver" contention, summary adjudication was not precluded on this ground.

## F. Standing

CMH challenges plaintiffs' standing to seek enforcement of the prevailing wage requirement. However, CMH cites no statutory or case authority to support its claim. Its entire argument is devoted to distinguishing various cases in which courts concluded that parties *did* have standing.

Prevailing wage requirements are intended "to protect employees from substandard wages that might be paid if contractors could recruit labor from distant cheap-labor areas; [and] to permit union contractors to compete with nonunion contractors." (*Lusardi Construction Co. v. Aubry* (1992) 1 Cal.4th 976, 987 [4 Cal.Rptr.2d 837, 824 P.2d 643].) Plaintiffs include a union, an association of unions, an association of local contractors, and two local taxpayers. Local and union contractors had a beneficial interest in the enforcement of the prevailing wage requirement because it was intended to benefit them. " '[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.' " (*Brotherhood of Teamsters & Auto Truck Drivers v. Unemployment Ins. Appeals Bd.* (1987) 190 Cal.App.3d 1515, 1522 [236 Cal.Rptr. 78].)

"Any person interested under a written instrument . . . who desires a declaration of his or her rights or duties with respect to another . . . may, in cases of actual controversy relating to the legal rights and duties of the respective parties, bring an original action or cross-complaint in the superior court for a declaration of his or her rights and duties in the premises, including a determination of any question of construction or validity arising under the instrument or contract. . . . The declaration may be had before there has been any breach of the obligation in respect to which said declaration is sought." (Code Civ. Proc., § 1060.)

Here, the individual contractors represented by plaintiffs were "interested under a written instrument" in the enforcement of the prevailing wage covenant. There was an "actual controversy" about this issue because CMH insisted that the covenant did not apply to its Marina Heights project. A declaratory relief action was authorized even though CMH had yet to breach

the covenant.[19] The interests that plaintiffs sought to protect were germane to the purposes of their associations, and the participation of individuals members was not necessary. Consequently, the unions and associations had standing to litigate this action on their members' behalf.

## G. Attorney's Fees

CMH contests the trial court's attorney's fees award on two grounds. It claims that plaintiffs were not entitled to claim any attorney's fees under Code of Civil Procedure section 1021.5 because they failed to satisfy the statutory requirements. CMH also claims that the trial court awarded an excessive amount of fees.

"Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity, are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any." (Code Civ. Proc., § 1021.5.) "The decision whether to award attorney fees pursuant to this statute lies within the discretion of the trial court and will not be disturbed on appeal absent a prejudicial abuse of discretion resulting in a manifest miscarriage of justice." (*Galante Vineyards v. Monterey Peninsula Water Management Dist.* (1997) 60 Cal.App.4th 1109, 1125 [71 Cal.Rptr.2d 1].)

 CMH claims that there is no support for the trial court's express finding that the litigation "resulted in the enforcement of an important right affecting the public interest." The trial court explained its rationale for this finding. "The issue of attaching restrictions to the deeds granted by redevelopment agencies to developers is often raised in construction projects in this state" and "has ramifications . . . beyond the interests of the parties directly before the court." "[I]n determining the 'importance' of the particular 'vindicated' right, courts should generally realistically assess the significance of that right in terms of its relationship to the achievement of fundamental legislative goals." (*Woodland Hills Residents Assn., Inc. v. City Council* (1979) 23 Cal.3d 917, 936 [154 Cal.Rptr. 503, 593 P.2d 200].) Here, FORA's goal was to ensure that the prevailing wage was paid on all development projects

---

[19] While this was an action for both declaratory and injunctive relief, CMH does not claim that plaintiffs had standing to seek only one type of relief, so we need not consider whether plaintiffs also had standing to seek injunctive relief, which was ancillary to the declaratory relief here.

on FORA land so that local contractors would not be displaced by cheaper labor imported from elsewhere. Providing well-paying jobs for local contractors served FORA's purpose, which was the revitalization of the local economy. This litigation vindicated FORA's use of deed covenants to obligate downstream developers to honor the prevailing wage requirement. ▮▮▮ Prevailing wage requirements serve the public interest. (*Plumbers & Steamfitters, Local 290 v. Duncan* (2007) 157 Cal.App.4th 1083, 1097–1098 [69 Cal.Rptr.3d 184].) The court did not abuse its discretion in finding that this litigation vindicated an important right affecting the public interest.

▮▮▮ CMH also challenges the court's finding that plaintiffs' action conferred a significant benefit on a large class of persons. CMH claims that the only benefit was to "the unions' interests." "This element is met if the cost of the claimant's legal victory transcends his personal interest—that is, when the burden of the litigation was disproportionate to the plaintiff's individual stake in the matter." (*Roybal v. Governing Bd. of Salinas City Elementary School Dist.* (2008) 159 Cal.App.4th 1143, 1151 [72 Cal.Rptr.3d 146].) The court found that plaintiffs' enforcement action was necessary because no public agency was willing to pursue this litigation. The trial court concluded that the financial burden of the fees far exceeded the financial value of the litigation to plaintiffs because "[p]laintiffs' pecuniary benefit will be indirect and uncertain." These findings were supported by the evidence. The evidence also reflected that this action "benefitted a large class of persons" because the Marina Heights project and the Garrison project would provide work for 900 construction workers, many of whom would not be union members. Hundreds of construction workers is a "large class of persons," and the fact that many of these workers would not be union members further demonstrated that this action conferred benefits which transcended plaintiffs' stake in the matter.

Finally, CMH urges that it "was hit with an inequitable portion of the fees" which should have been borne by the other defendants in the action. CMH made this argument below, and the trial court limited the attorney's fees award against CMH to 35 percent of the amount sought. The court found that "Plaintiffs' time spent on this entire action was useful and necessary to its ultimate resolution." This finding was supported by evidence that plaintiffs had incurred substantial fees for "common work . . . done on common issues" that was applicable to each of the defendants. On this basis, the court rejected CMH's claim that it should not be responsible for any fees other than those attributable to plaintiffs' summary judgment/summary adjudication motion against CMH. While some of the fees incurred by plaintiffs may not have been attributable to common issues, there is no indication in the record that the trial court's award of 35 percent of the fees sought included any such fees. We can find no abuse of discretion in the amount of the trial court's limited attorney's fees award.

## IV. Disposition

The judgment is affirmed.

Bamattre-Manoukian, Acting P. J., and McAdams, J., concurred.